[L. A. No. 23043. In Bank. Feb. 29, 1960.]

THE IVANHOE IRRIGATION DISTRICT, Plaintiff and Appellant, v. ALL PARTIES AND PERSONS etc., Defendants; COURTNEY McCRACKEN et al., Respondents; THE PEOPLE, Defendant and Appellant.

[Sac. No. 6489. In Bank. Feb. 29, 1960.]

MADERA IRRIGATION DISTRICT, Plaintiff and Appellant, v. ALL PERSONS etc., Defendants; JOHN HUMPHREYS et al., Respondents; THE PEOPLE et al., Defendants and Appellants.

Edmund G. Brown and Stanley Mosk, Attorneys General, B. Abbott Goldberg, Assistant Attorney General, Adolphus Moskovitz, Deputy Attorney General, E. I. Feemster, James R. McBride, David E. Peckinpah, Denver C. Peckinpah, Harold M. Child, and L. N. Barber for Appellants.

J. Lee Rankin, Solicitor General of the United States, Perry W. Morton, Assistant Attorney General, David R. Warner and Roger P. Marquis, Attorneys, Department of Justice, Roy A. Gustafson, District Attorney (Ventura), James E. Dixon, Deputy District Attorney, and McCormick, Moock & McCormick as Amici Curiae on behalf of Appellants.

Harry W. Horton, Reginald L. Knox, Horton & Knox, Horton, Knox & Carter, M. A. Bailey, W. R. Bailey, Henry Holsinger, Principal Attorney, Division of Water Resources, Gavin M. Craig, Senior Attorney, Denslow B. Green, Sherwood Green, Green, Green & Plumley, Green, Green & Bartow, Coffee & Wolfe, Dowell & Thompson, Virgil C. Dowell, Brobeck, Phleger & Harrison, Herman Phleger, Alvin J. Rockwell and John M. Naff, Jr., for Respondents.

Edson Abel as Amicus Curiae on behalf of Respondents.

PETERS, J.—For convenience these two appeals will be disposed of in one opinion.

The facts in reference to the Ivanhoe case are as follows: On September 23, 1949, the district, acting under the Irrigation District Federal Cooperation Law (Wat. Code, §§ 23175

et seq.), entered into a contract with the United States, acting through the Bureau of Reclamation of the Department of the Interior, for the delivery of a supply of water to the district for irrigation purposes from the Central Valley Project, and for the construction of a distribution system to make the water available on lands within the district. The validity of the organization of the district is conceded. As required by law, the contract was approved by the California District Securities Commission with reservations (Wat. Code, §§ 23222 and 24253), and was overwhelmingly approved by a vote of the district's electors (Wat. Code, §§ 23220 et seq.). A proceeding was then instituted in the proper superior court to have the contract confirmed, which is required by federal law (Omnibus Adjustment Act of 1926, § 46, 44 Stat. 649, 43 U.S.C. § 423e), by section 42 of the contract, and by California law (Wat. Code, §§ 22670 et seq., § 23225).

This proceeding is *in rem* in nature. In such an action the only issue involved is the validity of the contract.

Courtney McCracken, the owner of 309 irrigable acres within the district, appeared as the only individual defendant objecting to confirmation. He is a bachelor, so that under the contract he is entitled to have water distributed to only 160 of his acres. He is a nonresident of the district so was unable to participate in the confirmation election held in the district (Wat. Code, § 23220 et seq.). He opposed confirmation, mainly on the ground that the 160-acre limitation was invalid as to him and to his property.

The United States government has never appeared in the action as a party, but the Regional Counsel and the Assistant Regional Counsel of the Department of the Interior received permission to appear as amici curiae in the trial on the side of those seeking confirmation. Federal counsel not only appeared at and participated in the trial of the action in this capacity, but appeared on the prior appeal in this court, on the proceedings in the United States Supreme Court, and have participated in the proceedings now involved in this court.

Counsel for the Di Giorgio Fruit Corporation, the owner of large areas of irrigated and irrigable lands in the San Joaquin Valley in and out of the district appeared as amici curiae in opposition to the confirmation.

The Water Project Authority of the State of California also appeared in the action before judgment, and assumed a

neutral attitude so far as the validity of the contract was concerned. It asked for a declaration of the rights of the parties, and further requested that the decree not adjudicate the right or interest in or to water, or water rights, or respecting the regulation or use thereof, under the laws of the state, on the ground such issues were not involved. The attorney for the Division of Water Resources of the Department of Public Works of California appeared as an amicus curiae on behalf of the Water Project Authority.

Other amici curiae have appeared on behalf of both sides of this controversy at various stages of these proceedings.

The trial court denied confirmation of this contract on various grounds, and entered its judgment accordingly.[1]

The Ivanhoe Irrigation District, the State of California and the Water Project Authority of the state appealed. This court, by a four to three vote, affirmed the trial court. (*Ivanhoe Irr. Dist.* v. *All Parties,* 47 Cal.2d 597 [306 P.2d 824].) Certiorari was granted by the United States Supreme Court, and that court reversed this court (*Ivanhoe Irr. Dist.* v. *McCracken,* 357 U.S. 275 [78 S.Ct. 1174, 2 L.Ed.2d 1313]).[2] Pursuant to this reversal, this court recalled the remittiturs, permitted all interested parties and amici curiae to rebrief the problems involved in view of the decision of the United States Supreme Court, and placed the cases on the calendar for oral argument.

The Madera case has had substantially the same history. It involves an appeal by the plaintiff Madera Irrigation District and certain of the defendants from a judgment refusing to confirm a proposed contract between the United States, acting by and through the Bureau of Reclamation of the Department of the Interior, and the Madera Irrigation District. The contracts involved in the Ivanhoe and Madera cases are substantially similar. In its prior opinion (*Madera*

[1]Under the applicable statute if the contract fails of confirmation on one material ground it must fail of confirmation as a whole (Wat. Code, § 22680).

[2]There were four separate cases dealing with the problems here presented. (*Ivanhoe Irr. Dist.* v. *All Parties,* 47 Cal.2d 597 [306 P.2d 824]; *Madera Irr. Dist.* v. *All Persons,* 47 Cal.2d 681 [306 P.2d 886]; *Albonico* v. *Madera Irr. Dist.,* 47 Cal.2d 695 [306 P.2d 894]; *Santa Barbara etc. Agency* v. *All Persons,* 47 Cal.2d 699 [306 P.2d 875]). The main opinion of this court was written in the Ivanhoe case, and shorter opinions in the other three cases. The United States Supreme Court disposed of all four cases in one opinion. (*Ivanhoe Irr. Dist.* v. *McCracken,* 357 U.S. 275 [78 S.Ct. 1174, 2 L.Ed.2d 1313].) We have decided in the present proceedings to write one opinion in the Ivanhoe and Madera cases and separate opinions in the other two cases.

*Irr. Dist.* v. *All Persons,* 47 Cal.2d 681 [306 P.2d 886]) this court at page 684 discussed the background of the Madera case as follows:

"As in the Ivanhoe contract the United States undertook to deliver water for irrigation purposes from the Central Valley Project to the district and to expend funds for the construction of a distribution system within the district. This proceeding, also an *in rem* special proceeding to obtain the confirmation of the proposed contract, was brought by the district pursuant to the provisions of sections 22670 et seq. and section 23225 of the Water Code. The federal law (Omnibus Adjustment Act of 1926, § 46, 44 Stats. 649, 650, 43 U.S.C. § 423e, Federal Reclamation Laws Ann. 318-319) and article 36 of the contract require the validity or invalidity thereof to be determined by a court of competent jurisdiction. The contract in question was entered into on May 14, 1951, by the district acting under the Irrigation District Federal Cooperation Law. (Wat. Code, §§ 23175 et seq.) On the 26th of March, 1951, the California Districts Securities Commission, with reservations, approved the contract (Wat. Code, §§ 23222, 24253), and the electors of the district subsequently approved it by a vote of 1979 to 755 (Wat. Code, §§ 23220, 23221, 21925-21935). The district commenced this proceeding on the 21st day of May, 1951. Eighty-six landowners within the district, and four landowners outside of the district filed answers in which they opposed the confirmation of the contract. The State of California and the Water Project Authority of the State of California, by and through the attorney general, filed a joint answer. The state prayed that the contract be validated and a separate prayer recited that the Water Project Authority 'is not taking any position upon the validity of the contract' and requested the court to declare that its decree 'does not purport to be an adjudication of the right or interest of the State of California or its agencies . . . or of the right or interest of the United States or its agencies . . . in or to the water or water rights . . . involved in the Central Valley Project.'

"After the statutory time for filing an answer had expired, leave of the court was granted the State Engineer of the State of California, acting in his capacity as such and ex-officio as Chief of the Division of Water Resources, Department of Public Works, to file a separate answer by counsel for the Division of Water Resources. The State Engineer took no

position as to the validity of the contract, stating that his object was to protect the state law relating to water use and control. Regional counsel for the Bureau of Reclamation of the Department of the Interior were granted leave by the court to appear as amici curiae and as such participated throughout the proceedings in the trial court in support of the confirmation of the contract.'' The trial court (the same court as was involved in the Ivanhoe case) entered its judgment denying confirmation for substantially the same reasons it had set forth in the Ivanhoe case. The findings and conclusions in this case also disposed of certain issues not involved in the Ivanhoe case.

In its prior opinion in the Madera case this court also stated (47 Cal.2d at p. 685): ''The appellants are the State of California represented by the attorney general who seeks a reversal of the judgment, the plaintiff district which seeks a reversal, and the State Engineer as Chief of the Division of Water Resources of the Department of Public Works who asserts the invalidity of the contract but contends that the trial court erred in a determination that a right to the use of water is acquired by duly filing an application to appropriate water without perfecting it. The respondents, who seek an affirmance of the judgment, are supported by the Di Giorgio Fruit Corporation as amicus curiae. The Ventura County Flood Control District has appeared as amicus curiae in support of the appellants and seeks to establish that the trial court's determination that water rights involved have become appurtenant to the lands upon which water is being or is to be used is not in accordance with existing law.''

The nature of the Central Valley Water Project is fully described in the prior opinion of this court and need not be repeated here (47 Cal.2d 686 and 687).

This court, as in the Ivanhoe case, by a four to three vote, affirmed the judgment with modifications (*Madera Irr. Dist.* v. *All Persons,* 47 Cal.2d 681 [306 P.2d 886]). This decision was also reversed by the United States Supreme Court (*Ivanhoe Irr. Dist.* v. *McCracken,* 357 U.S. 275 [78 S.Ct. 1174, 2 L.Ed.2d 1313]). The remittitur was recalled, the issues rebriefed by the parties, and the case orally argued.

In the opinion that follows the parties contending that the contracts between the federal government and the irrigation districts are invalid will be referred to as Objectors. Those seeking confirmation of the contracts and contending they are valid will be referred to as Confirmers.

The Objectors' main contentions now are that the prior decisions of this court held that the contracts are invalid under state law; that in any event, the question as to whether the districts involved possess capacity to enter into such contracts is a state and not a federal question; that under state law the districts lack such capacity; that even if the contracts are otherwise valid, the election proceedings purportedly ratifying the contracts were abortive in that the election notices were improper.[3] Special points are also made as to the Albonico case which will be passed on in the opinion in that case.

The Confirmers contend that in its prior decisions this court held that federal law made the state law applicable to these contracts; that under state law the contracts were invalid; that the United States Supreme Court held that this construction, as a matter of federal law, was erroneous; that it also held that the contracts were valid under federal law; that this being so no questions as to the validity of the contracts remain to be decided; that, in any event, if this court were now to rule that the districts lacked capacity to enter into the contracts the decision would be reviewable by the United States Supreme Court; that in deciding this case the high court clearly indicated that the question of validity was a federal question; that the election proceedings were valid in that the notice requirements of the Water Code were complied with; that, in any event, the only ones who could object to defects in the notices are voters in the districts; that none of the Objectors are such voters; and that, even if the election notices were defective, the defects have been obviated by subsequent elections on supplementary contracts.

As will be later pointed out at some length, as a result of the United States Supreme Court decision, the issues in these cases have been greatly simplified. In its prior opinions this court held that title to the water was involved, and purported to determine the nature of the state's title and the title of the United States to such water. It held that all the water involved was held subject to an express trust by the state, and that the federal government, however it secured its rights, held the water subject to the terms of this trust. The United States Supreme Court held that the federal government either

[3]This point about the election notices was not considered by this court in its prior opinions because the contracts were held to be invalid for other reasons. If the contracts are, as we hold later, valid, then the validity of the election notices must be passed upon.

had title to the water free of the trust or could by direct or inverse condemnation secure such title. That being so, it is now obvious that the question of title to the water is not involved.

The problem left for determination on the issue of the validity of the contracts is thus now quite simple. The federal government with federal funds has lawfully developed water —project water—that without the project would not have been developed. The United States and the State of California have provided by appropriate legislation for entering into contracts regarding this water, and have provided certain limitations on its use, so that the water thus developed will reach the ultimate user subject to those conditions. This water belongs to or by appropriate action may be secured by the United States. In a very real sense it is or will become the property of the United States.

As was stated by the United States Supreme Court (*Ivanhoe Irr. Dist.* v. *McCracken,* 357 U.S. at p. 295):

"Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges. [Citing cases.] The lesson of these cases is that the Federal Government may establish and impose reasonable conditions relevant to the federal interest in the project and to the over-all objectives thereof. Conversely, a State cannot compel use of federal property on terms other than those prescribed or authorized by Congress. [Citing cases.] Article VI of the Constitution, of course, forbids state encroachment on the supremacy of federal legislative action."

Thus, on the question of the capacity to contract, the only question that was ever involved in these cases was whether the United States and the districts have the legal capacity to enter into a contract whereby the United States agrees to sell and the districts agree to buy water subject to conditions. The United States Supreme Court has held the federal government may so contract and that such a contract does not violate due process or deny equal protection of the laws. The only question remaining on this phase of the case is whether the districts have the legal capacity to contract to buy the water under state law. As will be pointed out later, the state law expressly confers such capacity upon irrigation districts. That is the end of this phase of this case.

The arguments of counsel have gone far afield in discussing this issue. Counsel on both sides have conscientiously and

exhaustively discussed many difficult constitutional questions, both under the federal and state Constitutions, and have discussed many other legal points, none of which is involved once the issues are limited, as they should be, to the problems here presented.

Before directly passing on the issue of capacity of the districts to enter into such contracts, a brief reference to the background facts should be made, and an analysis made of the effect of the opinion of the United States Supreme Court on the prior opinions of this court.

First as to the background facts:

California has a serious water problem particularly in the Central Valley. The state for many years has been attempting to cope with that problem (47 Cal.2d at 613). Unable to solve the problem without outside aid, in the 1930's the state enlisted the aid of the federal government (47 Cal.2d at 616). Since then the federal Bureau of Reclamation under the Reclamation Act of 1902 and amendments thereto has been cooperating with some of the California irrigation districts to bring water to the parched areas of the state (47 Cal.2d at 616). This cooperation was thought to have been made possible by state law under the "Irrigation District Federal Cooperation Law" originally enacted in 1917 (Stats. 1917, ch. 160) and codified in 1943 as sections 23175 et seq. of the California Water Code.

One of the main features of the federal Reclamation Act of 1902 under which the Bureau of Reclamation operates is the so-called excess land provision. That provision, section 5 of the act, reads in part: ". . . No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, . . ." (32 Stat. 389, 43 U.S.C. § 431). Section 8 of the act states that "nothing in this Act shall be construed as affecting or intended to affect or in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, . . ." (32 Stat. 390, 43 U.S.C. § 383).

Sections 9(d) and 9(e) of the Reclamation Act provide for the type of repayment arrangements which the federal agencies may include in their contracts with the districts. Section 9(d) authorizes contract terms for repayment for the

cost of local distribution facilities over a maximum of forty years. Section 9(e), in lieu of 9(d) terms, authorizes the federal agency to enter into long and short term contracts for the furnishing of water from central federal water supply facilities to the districts. The act was amended in 1956 to insure that the contracts included certain safeguards for the districts with regard to sections 9(d) and (e), including provisions insuring a right of renewal under 9(e) supply contracts, provisions insuring that payments made by state agencies above and beyond the cost and operation of federal facilities would be credited toward liquidation of the district's obligation, and to determine as soon as practicable the total obligation owing by the districts.

Irrigation districts are authorized by state law to enter into contracts with the United States. (Wat. Code, § 23195.)

As already pointed out the Ivanhoe district filed this action seeking a confirmance of the contract between it and the federal government. The contract contains both the section 9(d) and section 9(e) features to which reference has been made. Various provisions to secure the payments of the obligations to the federal government are also contained in the contract. Articles 35-37 of the contract deal with the "excess land" provisions. Generally, excess land is defined as irrigable land exceeding 160 acres in ownership of a single person or 320 acres held by husband and wife.[4]

[4]Of course, the contracts do not affect any water other than project water. Landowners within the districts that have contracted with the federal government retain their rights to existing water supplies, or to any water developed by them not involved in the federal project. In fact the very contracts here involved even recognize that delivery of federal project water will benefit adjoining excess land of the landowner by increasing the underground supply through seepage, and expressly provide that the United States does not claim "any right, as waste, seepage or return flow to water being used pursuant to this contract for surface irrigation."

The United States Supreme Court stated as to these provisions (357 U.S. at p. 296): "The contracts themselves indirectly refer to the benefits that may accrue, through underground water improvement, to excess owners, by provisions which declare that such water shall not be considered as furnished by the project. In other words, any benefits to the underground water level under excess acreage will not be chargeable to the owner of such acreage, *but still will be available to his excess land.*" In the footnote the court quoted evidence in the record in support of these conclusions.

It should also be pointed out that there is no reasonable doubt but that the owner of land in excess of 160 acres may receive water for 160 acres (320 if he is married) without being required to enter a recordable contract for the sale within ten years of his excess holdings. The provi-

The basic contention of the Objectors is that there is an adequate state ground upon which this court has declared, or can or should declare, the contracts involved in these cases to be invalid. These contentions center around the 160-acre provision and the "trust" theory announced by this court in its prior opinion.

The basic holding of this court in these cases was that section 8 of the Reclamation Act left this court free to apply state law. "[T]he federal government both by legislation and court decision has recognized that the law of this state is determinative of rights to water in this state." (47 Cal.2d at 628.) This court announced that under the law of the state "the title to the unappropriated domestic waters of the state is in the State of California in trust for the water users of the state as beneficiaries and such waters are subject to appropriation under the laws of the state." (47 Cal.2d at 647; see also 47 Cal.2d 624.) This holding was predicated on this court's theory that section 8 of the Reclamation Act empowered it to apply California law to the contracts. This court stated that because of section 8, "*We therefore feel free* to declare that in all transactions between the United States and the State of California or its agencies such as the plaintiff district, the parties are dealing with trust property held by the state or by those who have acquired rights to it from the state or otherwise for the benefit of the real owners thereof." (47 Cal.2d at 628 [emphasis added].)

After holding that by virtue of federal law the state law was made applicable, this court then ruled that under state law certain provisions of the contracts were invalid, that is the provisions dealing with the 160-acre limitation required by section 5 of the Reclamation Act (47 Cal.2d at 636), and sections 9(d) and (e) provisions dealing with the repayment

sion for sale of excess lands (§ 46 of the Omnibus Adjustment Act of 1926, 44 Stat., ch. 383, p. 649), only applies where the landowner receives project water for his excess lands. The contracts here involved so provide. Authorities in this field have so concluded. (See Taylor, *The Excess Land Owner: Execution of a Public Policy*, 64 Yale L. J. 477, 486; see also an article by Leland O. Graham, former Regional Counsel of the Bureau of Reclamation, entitled *The Central Valley Project: Resource Development of a Natural Basin*, 38 Calif. L. Rev. 588, 606.)

Thus not only may a large landowner receive water for 160 acres without being required to agree to sell his excess land, but he may supply his excess land with water from sources other than the federal project.

Thus a large landowner may properly realize any increased value to his excess land caused by his own efforts in developing water, and is only denied the unearned increased value caused by using federal project water on his excess holdings.

for water supply and construction of distribution facilities (47 Cal.2d 641).

The holding of this court that section 8 of the Reclamation Act made state law applicable to these contracts, was directly reversed by the United States Supreme Court. The high court stated: "The opinion of the Supreme Court of California turned on an interpretation of . . . § 8 of the Reclamation Act of 1902. That section provides that the Act is not to be construed as interfering with state laws 'relating to the control, appropriation, use, or distribution of water used in irrigation.' It further provides that in administering the Act the Secretary of the Interior 'shall proceed in conformity with such laws. . . .' The California court held that this provision required the application of California law, and finding the provisions of the contracts contrary thereto, it refused confirmation." (357 U.S. at 278.) And again: "In effect, the [California] court held that this section [§ 8] overrides all other sections of the Act, requiring that it be construed as not affecting state laws 'relating to the control, appropriation, use, or distribution of water used in irrigation.' Turning to state law, the court by applying a 'trust theory' held that the Federal Government could acquire no title to appropriative water rights free of a trust in the State of California for the benefit of the people of the State. This 'limited measure of control' of the appropriative water, the court said, 47 Cal.2d, at 620 . . ., prevented the imposition of the 160-acre limitation because the beneficiaries of the trust, namely, the people of the State and particularly those in the districts involved, would be deprived by the acreage limitation of a right to the use of the water in the district. We think it plain that this was a construction of federal law and not a holding of unconstitutionality." (357 U.S. at 289.)

The United States Supreme Court then held that this court's construction of section 8 of the Reclamation Act was erroneous. "As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operations of federal projects. As the Court said in *Nebraska* v. *Wyoming, supra,* [325 U.S. 589 (65 S.Ct. 1332, 89 L.Ed. 1815)] at 615: 'We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system.' Section 5 is a

specific and mandatory prerequisite laid down by the Congress as binding in the operation of reclamation projects, providing that '[n]o right to the use of water . . . shall be sold for a tract exceeding one hundred and sixty acres to any one landowner. . . .' We read nothing in § 8 that compels the United States to deliver water on conditions imposed by the State. To read § 8 to the contrary would require the Secretary [of Interior] to violate § 5, the provisions of which, as we shall see, have been national policy for over half a century." (357 U.S. at 291.)

This construction of section 8 of the Reclamation Act, that statute being a federal law, is, of course, binding on this court. Under that interpretation the Supreme Court of the United States has held that section 8 cannot be used to invalidate the contracts by interpreting into them the state law.

It follows, of course, that, as a result of the United States Supreme Court's construction of section 8 of the Reclamation Act, the holding of this court on the prior appeals that the 160-acre limitation was in violation of the "trust" duties imposed upon the public owners of water rights by state law, was erroneous. This is true because this court thus defined the basic "duty" that it then thought was being violated: "The duty of both of the contracting parties in the performance of their obligations to the landowners in the district is set forth in section 22250 of the Water Code. It is there provided that water distributed by districts shall be 'apportioned ratably to each landowner upon the basis of the ratio which the last assessment against his land for district purposes bears to the whole sum assessed in the district' except as provided otherwise in the code. No pertinent exceptions appear." (47 Cal.2d at 636.) Distribution of water in violation of the trust duty as stated in section 22250 was held to be a denial of property without due process of law. Similarly, "[I]n addition to his right to due process, the landowner McCracken is entitled to equal protection of the laws. Discrimination among water users in an irrigation district is expressly contrary to state law *as expressed in the above quoted section 22250 of the Water Code.*" (Emphasis added.)

But, as a result of the high court's ruling with regard to section 8, pertinent exceptions to section 22250 *do* appear, namely, Water Code, sections 23197 and 23200. Section 23197 reads in part: "In a contract made pursuant to Section 23196

[stating the purposes] a district may include provision for either or both of the following:

"(a) Delivery and distribution of water for the land in the district *under the relevant acts of Congress and the rules and regulations thereunder.*

"(b) . . ." (emphasis added).

Section 23200 reads: "All water, the right to the use of which is acquired by a district under any contract with the United States shall be distributed and apportioned by the district in accordance with the applicable acts of Congress, the rules and regulations of the Secretary of the Interior thereunder, and the provisions of the contract, . . ."

This court had reasoned that sections 23197 and 23200 were not alternatives to section 22250 because the federal law referred to therein was necessarily controlled by section 8 of the Reclamation Act. Since section 8 made state law applicable, these sections were not "exceptions" to section 22250. However, now that the United States Supreme Court has ruled that this court's interpretation of section 8 was erroneous, it necessarily follows that sections 23197 and 23200 *do* become alternatives to section 22250 with regard to the manner in which water may be distributed under state law. Delivery, distribution and apportionment of water under the authority of these sections may be in accordance with the relevant and applicable acts of Congress, the rules and regulations of the Secretary of the Interior thereunder, and the provisions of the contracts. Since the rule as announced by this court was that "[T]he United States cannot administer the corpus of that trust except in the manner defined by the terms of the trust, namely, the applicable water law of this state" (47 Cal.2d at 642), the applicable water law of this state as a result of the high court's reversal of this court's construction of section 8 of the Reclamation Act includes sections 23197 and 23200 which authorize the delivery, distribution and apportionment of water under the applicable acts of Congress.

Thus, even if the holding of this court in its prior opinion in reference to the trust theory were sound, and even if such holding constituted the law of the case, which it does not, it would have no application to the present proceeding. This court in its prior opinion correctly held that the State Legislature may provide rules and regulations for the administration of the trust. This has been done in sections 23197 and 23200. This court stated: "They [as trustees, the state and its agencies] must administer it [the trust] consistently with

and not in violation of the rights of the beneficiaries. [Citations.] But it is not to say that the state may not in the administration of the trust prescribe or provide for reasonable terms and conditions to which the beneficiaries must conform in order to have the benefit of expenditures made necessary in providing those benefits. These may be provided for by statute or, as here, by contracts when duly authorized by law.'' (47 Cal.2d at 625.)

In its prior opinion this court held the 160-acre provisions of the contracts unreasonable (47 Cal.2d at 637). But, as has been pointed out, this holding was based on the proposition that one of the ''rules'' for the administration of the ''trust,'' that is the manner of apportionment found in Water Code, section 22250, was being violated, and therefore that (1) an ''inchoate right to the use of water within the district'' (47 Cal.2d at 635), was being denied without due process of law (due process being the manner of distribution in § 22250), and that (2) landowner McCracken was being denied equal protection of the laws by a method of distribution contrary to that found in section 22250 (47 Cal.2d at 636). Now that the United States Supreme Court has ruled this court's interpretation of section 8 of the Reclamation Act erroneous, other methods than that found in section 22250 are authorized under state law, namely, methods in accordance with federal law. (Wat. Code, §§ 23197, 23200.)

The Supreme Court of the United States also held that the federal law imposing the 160-acre limitation is ''reasonable'' on its face: ''In any event, the provisions under attack are entirely reasonable and do not deprive appellees [''large landowners'' within the districts] of any rights to property or water. It is beyond dispute that excess land will be benefited by delivery of water to neighboring and nearby nonexcess land. . . . We therefore find no substance in the contention that 'possible severance' of the excess acreage will result in damage constituting a taking of property without just compensation. We deem it unnecessary to discuss other claims in this area, but repeat in connection therewith that if the United States takes any compensable water or property right the courts are open for redress.

''As to the claim of discrimination in the 160-acre limitation, we believe that it overlooks the purpose for which the project was designed. The project was designed to benefit people, not land. It is a reasonable classification to limit the amount of project water available to each individual in order

that benefits may be distributed in accordance with the greatest good to the greatest number of individuals. The limitation insures that this enormous expenditure will not go in disproportionate share to a few individuals with large land holdings. Moreover, it prevents the use of the federal reclamation service for speculative purposes. In short, the excess acreage provision acts as a ceiling, imposed equally upon all participants, on the federal subsidy that is being bestowed.'' (357 U.S. 296.)

The Objectors contend that this court should now rule as a matter of state law that irrigation districts have no legal capacity to enter into the contracts in question with the federal government. It is urged that such districts are instrumentalities of the state and as such may not enter into contracts that would be in violation of its fiduciary duty imposed by California law. Whatever the merits of this argument may have been as long as this court believed that section 8 of the Reclamation Act excluded the application of federal law in determining the rights of the parties, since the Supreme Court has ruled that section 8, properly interpreted, does not exclude the application of section 5, the basic premise of the argument necessarily falls.

As has already been pointed out, the irrigation districts are not violating any fiduciary duty by entering into contracts with the federal government containing the 160-acre limitation. The prior opinions of this court were predicated on the theory that irrigation districts, by entering into such a contract as is here involved, would be violating their fiduciary duty as to the manner in which they can deliver and distribute water under section 22250 of the Water Code. But because of the interpretation placed upon section 8 of the Reclamation Act by the United States Supreme Court it now must be held that section 22250 does not provide the only means of delivery and distribution of water under state law, that is, one of the conditions of the trust now is that under sections 23197 and 23200 such districts may deliver and distribute water in conformity with federal law.

Thus the argument that this court should declare that irrigation districts are not authorized under state law to enter into the contracts with the federal government is entirely without merit. The state Legislature has vested specific authority in the irrigation districts to do this very thing. Section 23195 of the Water Code provides: ''Districts may cooperate and contract with the United States under the

Federal Reclamation Act of June 17, 1902, and all acts amendatory thereof or supplementary thereto or any other act of Congress heretofore or hereafter enacted permitting cooperation.'' If this court were now to rule that the districts have no capacity to enter into contracts with the federal government such ruling would be directly contrary to the specific intent of the Legislature as expressed in section 23195 of the Water Code.

The United States Supreme Court time and again pointed out that the Central Valley Project was a federal project. That court also pointed out that the project involved major federal subsidies. This being so the projects are subject to reasonable federal regulation, including the 160-acre limitation.

The following statements of the United States Supreme Court are here pertinent:

''There can be no doubt of the Federal Government's general authority to establish and execute the Central Valley and Santa Barbara County projects. As we said in *United States* v. *Gerlach Live Stock Co., supra* [339 U.S. 725 (70 S.Ct. 955, 94 L.Ed. 1231, 20 A.L.R.2d 633)], at 739, the Congress 'elected to treat it [the Central Valley Project] as a reclamation project.' We upheld its power to pursue the project as 'clear' and 'ample,' an exercise of the general power 'to promote the general welfare through large-scale projects for reclamation, irrigation, or other internal improvement.' *Id.*, [339 U.S.] at 738. . . . In developing these projects the United States is expending federal funds and acquiring federal property for a valid public and *national purpose,* the promotion of agriculture. This power flows not only from the General Welfare Clause of Art. I, § 8, of the Constitution, but also from Art. IV, § 3, relating to the management and disposal of federal property. As this Court said in *United States* v. *San Francisco,* 310 U.S. 16, 19-30 [60 S.Ct. 749, 84 L.Ed. 1050] (1940), this 'power over the public land thus entrusted to Congress is without limitations. ''And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.''' [Citations.]'' (357 U.S. at 294 [emphasis added].)

With regard to the power of Congress to regulate the use of federal funds, the court used language worth repeating: ''Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges. [Citing

cases.] The lesson of these cases is that the Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof. Conversely, a State cannot compel use of federal property on terms other than those prescribed or authorized by Congress. [Citing a case.] *Article VI of the Constitution, of course, forbids state encroachment on the supremacy of federal legislative action.*" (357 U.S. at 295 [emphasis added].)

With regard to the gift nature of the projects, the court stated: "The Central Valley Project is multi-purpose in nature. That portion of the project expense attributable to navigation, flood control, salinity prevention, recreation and fish and wildlife preservation is nonreimbursable [by the State to the Federal Government]. The remainder of the total expense, and the only part that is reimbursable, is divided between two main sources. The first is hydroelectric power which estimates indicate will be chargeable with over 50 percent of the reimbursable expense, plus interest on the part representing electric plants in service. The other is irrigation, which pays the rest without interest charge. In short, *the project is a subsidy, the cost of which will never be recovered in full*. . . . In the light of these facts we believe that the language of the Court in *Wickard* v. *Filburn,* 317 U.S. 111, 131 [63 S.Ct. 82, 87 L.Ed. 122] (1942), is apposite: 'It is hardly lack of due process for the Government to regulate that which it subsidizes.'" (357 U.S. at 295 [emphasis added].)

As already pointed out, as a result of the United States Supreme Court opinion, the legal issues involved are few and relatively simple. In spite of the Objectors' contentions to the contrary it is crystal clear that certain issues argued by them are not involved.

In the first place there is not involved in these cases any basic conflict between federal policy and law on one hand, and state policy and law on the other. For many years the two governments have peacefully and wholeheartedly cooperated in the planning and construction of this huge project. In the very truest sense of the terms it is and has been a cooperative project. Certainly there is no conflict between the legislative branches of the two governments. All legislation necessary for the project has been passed by the legislatures of the two governments. The federal Congress by the passage of section 5 of the Reclamation Act, has determined, lawfully,

that the 160-acre limitation, is a basic part of federal policy. The state Legislature has adopted this concept as state policy by specifically authorizing irrigation districts to enter into contracts for project water that contain the 160-acre limitation (Wat. Code, § 23195.)

The executive branches of the two governments are also in complete agreement. Not only have they cooperated for many years in the construction of this huge project but in this very case the State of California is a party, and the attorney general, speaking for the state and particularly its executive department, is actively seeking approval of the contracts. The United States, through its legal officers, appears as an amicus curiae urging affirmance of the contracts. The Objectors represent but a small minority of the landowners in the districts involved. As already pointed out, the contracts here involved were all approved by the overwhelming votes of the electors.

It is now also crystal clear that the title of the state or of the United States to the unappropriated waters of this state is not involved in these cases. The basic error of the prior opinion of this court was in holding that all such waters are held by the state subject to an express trust, and that the federal government, under section 8 of the Reclamation Act, however it gets title to such waters, also holds them subject to the terms of that express trust. But, as already pointed out, the United States Supreme Court held that this basic premise was erroneous. It expressly held that the United States may acquire, by condemnation if necessary, whatever water rights it may need to operate the project, and that after such acquisition such rights are not subject to state control. Thus, whether or not the United States now has complete title to the waters here involved, is totally immaterial to the issues involved on these appeals. The only issue before us is whether these contracts should be confirmed. Obviously, the federal government lawfully may contract to sell water that it does not own, as long as it has the legal power to secure title. The United States Supreme Court has declared as a matter of federal law that the United States possesses such power. That holding is binding upon this court. Whether the federal government acquires its water rights by purchase, by direct or inverse condemnation, by appropriation or by any other means is not material to a determination of the question as to whether the contracts are valid or should be confirmed. Whatever title the federal government may need

it can get. Thus, all that was said in the prior opinion about the state's title to water and about such water being held subject to the terms of an express trust was unnecessary to the opinion and for that reason was sheer dicta. We are not here dealing with state water, or with the title of the state to such water. The water involved either belongs to, or by appropriate action will belong to, the federal government. It is or may become federal water. In its former opinion this court labored at great length to establish the point that the federal government's title was limited by the state's title. This was specifically reversed by the United States Supreme Court. The entire discussion of the trust theory in the prior opinion of this court was part and parcel of establishing the limited nature of the title of the United States. Once it was established that the title of the United States was or can be made unlimited the necessity of discussing the nature of the state's title to water passed. When the erroneous ruling of this court that the title of the United States was limited passed out of this case the trust theory also passed out of this case. The trust theory was so interrelated to the erroneous interpretation of section 8 of the Reclamation Act, and so interwoven with that erroneous interpretation, that it must be held that it fell with that erroneous interpretation. Once it is established that state title to water is not involved in these cases it is obvious that anything said in the prior opinion of this court on the question of such title was dicta and, as such, cannot and should not be construed to be the law of the case. Nothing said about the trust theory in the prior opinion of this court had any relation to the capacity of irrigation districts to enter into contracts with the federal government for the purpose of federal project water. Thus the trust theory is not the law of this case, is dicta, and for that reason should not be construed as a statement of the law of California.

Much is said in the briefs about the claimed unfairness of the 160-acre provision. As already pointed out, the United States Supreme Court has held it not to be unfair, that no impairment of due process is involved and that equal protection has not been denied.

For the foregoing reasons it must be held that there is no merit to the Objectors' arguments that irrigation districts do not have capacity to enter into the type of contract here involved. As already pointed out, no trust duties are violated by doing so and the state statutes specifically authorize the districts to enter into such contracts. There is no merit in the lack of capacity argument.

*Repayment Provisions and the Passage of Title*

In interpreting the contracts here under consideration, this court in its former opinion found that certain features other than the 160-acre provision were objectionable. These provisions dealt with the terms and amount of repayment by the districts to the federal government, the manner in which the federal government was to reconvey certain facilities to the districts after they had been paid for by the districts, and the obligation of the federal government to continue to supply water after termination of the 40-year period of repayment.

This court interpreted the relationship between the United States and the districts to be that of debtor and creditor, (47 Cal.2d at 629) "for it is clear beyond question that they and the law under which they are operating contemplate that when the money expended by the United States has been repaid by the district or on its behalf, the district is entitled to an acquittance and will thereby become the owner of the distribution system and all of the property used and useful in the maintenance and operation thereof free and clear of any claims of others, . . ." Certain of the provisions relating to security were held valid. However, this court stated: "[I]t is the right and duty of the district to have included in the contract provisions for adequate clearance of its obligations to repay, including the designation therein of the amount expended or to be expended by the United States for the benefit of the district and its landowners, or to a workable provision therein as to how the amount advanced by the United States may be ascertained when the time for final accounting, repayment and acquittance arrives, together with the designation of a definite time when repayment is finally due. The present contract does not with certainty set forth such fiscal matters, particularly as it relates to repayment for the construction of the major storage facilities from which water will be delivered to the districts." (47 Cal.2d at 630.) The court continued: "[I]t is not clear in what way the district and its landowners may become free of indebtedness upon repayment. . . . The right and obligation on the part of the United States would seem to be to hold the property thus acquired by it in its own name only until final repayment is made, with the right of the district to a conveyance thereof not dependent on a future and necessarily discretionary act of Congress." (47 Cal.2d at 631.)

The objection by this court that the specific amount to be repaid the federal government was not set forth in the

contracts was answered in the following manner by the United States Supreme Court: "[T]he first [of the other objections is] . . . the failure of the contracts to recite a definite sum as being the total amount due for the water supply facilities. It was not possible at the time of executing the contracts, nor is it today, to determine the exact amount of expenditures necessary for dams and reservoirs. The record shows that original estimates often bore little resemblance to ultimate cost. The project is only two-thirds completed, and estimates of the remaining third cannot be accurately made. Moreover, the Government was not bound to determine in advance of the project's completion just what proportion of this total cost should be attributed to irrigation. In view of these uncertainties it would have been highly impractical, if not impossible, to recite any stated amount in the contract. Since no interest is charged on the amount due, it is difficult to see how harm or inconvenience is occasioned by the delay." (357 U.S. at 298.)

Objection by this court that the contract contained no provision for the passage of title at the end of the 40-year contract period was answered in the following manner by the United States Supreme Court: "[O]bjection was made to the absence of any provision to the effect that the districts would obtain title to the distribution systems when their obligations therefor had been totally discharged. . . . [W]e see no defect in the failure to guarantee passage of title to the local distributing systems at the end of 40 years when it is contemplated that the obligation therefor shall have been discharged. As we have pointed out, even the terms regarding the distribution systems involve a substantial federal subsidy because no interest is charged over the 40-year period during which the principal amount is repaid. In reality, the districts will *never* repay the total cost of these systems. Moreover, it is likely that for some time beyond the 40-year period of these contracts the districts will remain indebted to the Federal Government for their share of the cost of the water supply facilities. Under such circumstances the retention of title to the distribution systems, at least until the stated obligations of the districts are discharged, seems entirely consistent with what the state court thought was a 'debtor-creditor' relationship. In view of these considerations, we think it altogether reasonable for the Federal Government and the districts and agency involved to defer the question of title passage to another day." (357 U.S. at 298.)

With regard to the section 9(e) provisions of the contracts, this court stated: "The State Engineer contends that the United States improperly assumes to take section 9(e) as its authority for an alternate method of contracting with the state, that is, that the United States has construed that section to mean that, in lieu of a definite contract for repayment within 40 years, the United States may waive or avoid the repayment provisions in regard to its water rights and obligation to supply water to the district and substitute therefor the right to renew or not to renew the contract as the occasion might suit its purpose and elect to continue to serve the district with water but under terms and conditions which it might impose in the nature of an utility service, with no power upon the part of the district as the contracting agency of the state to prevent it from so doing." (47 Cal.2d at 641.) This court sustained this contention, and then held that the United States in purveying water to the districts acts in the nature of a public utility. Since under this court's interpretation of section 8 of the Reclamation Act the United States is subject to all the laws of this state, "the furnishing of water [even by the United States] to consumers by a utility must be subject to and be in conformity with certain rules and regulations established by or under the authority of the Constitution and statutes of the state." (47 Cal.2d at 642.) "Moreover," this court continued, since the United States holds its water right subject to a trust, "If this contract were construed as imposing upon the district and the landowners therein a burden under which they may suffer the loss of water rights at the discretion of the United States, such a construction would be contrary to well established constitutional principles and protections." (47 Cal.2d at 642.)

In response to these arguments the United States Supreme Court stated: "We also find the other contract provisions reasonable and necessary. As we have pointed out heretofore the Act of July 2, 1956, *supra,* [70 Stat. 483, 43 U.S.C.A. § 485h-1] answered most of the objections lodged against these requirements. That Act required the Secretary, in all § 9(d) and § 9(e) contracts executed after its passage, (1) to include a renewal provision, (2) to provide that during the term of the contract or any renewal thereof the contracting parties shall have 'first right . . . to a stated share or quantity of the project's water supply,' and (3) to determine as soon as feasible the total repayment obligation of the contracting parties, crediting against that obligation so much

of the amount paid for water supply as is unnecessary for operation and maintenance costs until, and only until, that obligation has been liquidated. The Secretary is authorized to negotiate amendments to existing contracts to incorporate the foregoing amendments. In view of the declarations and privileges incorporated in these amendments we see no room for objection to the contracts on the ground that they infer that the water users are not entitled to water rights beyond the 40-year terms of the contracts, or that they do not make clear that the districts and landowners become free of indebtedness upon repayment.'' (357 U.S. 297.)

In regard to the concern expressed by this court that water users of this state might suffer loss of their water rights at the end of the 40-year terms at the discretion of the federal government, the Supreme Court stated: ''Any suggestion that the Congress might be arbitrary in the final accounting, or trample upon any of the rights of appellees, is highly improbable. It does not seem untoward for the recipients of a huge federal bounty to have to depend in small measure on the continued beneficence of their donor. It would be a physical impossibility to withdraw the facilities. As for the possibility of discrimination in the administraton of those facilities, it seems far-fetched to foresee the Federal Government 'turning its back upon a people who had been benefited by it' and allowing their lands to revert to desert. The prospect is too improbable to figure in our decision.'' (357 U.S. at 299.)

Thus, the United States Supreme Court, as a matter of federal law, found that all the provisions of the contract deemed objectionable by the California Supreme Court were valid and reasonable. The high court also noted what appears to be a misconstruction upon the part of this court with regard to the distinction between section 9(d) and section 9(e) contracts: ''The repayment provisions as to the 'distribution systems' require liquidation of the maximum stated expenditure of the United States by installments spread over 40 years, without interest, in accordance with § 9(d) of the Reclamation Project Act of 1939. As to the 'water supply facilities,' such as the dams and reservoirs, the contracts employ the more liberal provisions of § 9(e) of that Act. Repayment, without interest, is to be included in the charge for water sold to the districts and the agency by the United States. The contract term runs for 40 years and, using the language of § 9(e), the water rate is calculated so as to return

to the United States 'revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation.' " (357 U.S. at 286.) In its opinion, this court appears not to have distinguished between the local distribution facilities envisaged under the section 9(d) contract, and the central water supply facilities under the section 9(e) contract. This court objected to the contract because it did not detail how the irrigation district was to obtain title to the water supply facilities: "The present contract does not with certainty set forth such fiscal matters, *particularly as it relates to repayment for the construction of the major storage facilities from which water will be delivered to the district.*" (47 Cal.2d at 631 [emphasis added].) The United States Supreme Court made it clear that this was erroneous: "We do not understand appellees to contend that the districts and landowners should ultimately obtain title to the principal dams and reservoirs. The fact that irrigation interests are bearing but a small fraction of the cost of the water supply facilities renders such a suggestion untenable." (357 U.S. at 298; see also Comment, 45 Cal. L. Rev. 763, 766.)

The construction the United States Supreme Court placed upon the provisions of the contracts is, of course, binding upon this court. This is so because, as the Supreme Court pointed out, the United States was a party to the contracts and therefore federal law controls their construction: "As to the rights and duties of the United States under the contracts, these are matters of federal law on which this Court has the final word, *Clearfield Trust Co.* v. *United States,* 318 U.S. 363 [63 S.Ct. 573, 87 L.Ed. 838] (1943). *Our construction of the contract might dispel any features thereof found offensive.*" (357 U.S. at 289 [emphasis added].) The same principle was stated as follows, in *United States* v. *Allegheny County,* 322 U.S. 174, 183 [64 S.Ct. 908, 88 L.Ed. 1209]: "The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all

present questions of federal law not controlled by the law of any State. [Citing cases.]" The United States Supreme Court held unequivocally that the United States is "exercising its constitutional functions" with regard to the water projects here involved. (See *supra,* and 357 U.S. at 294.) That court is necessarily the final arbiter of the extent of the federal government's power. If 50 different interpretations as to how far the federal government may go with regard to its constitutional powers were legally possible, utmost confusion would result. The suggestion by Objectors that this court should hold that the federal Constitution does not give the federal government "regulatory and coercive" powers with regard to the water projects here involved is therefore untenable. The final decision of the United States Supreme Court interpreting these contracts and holding them valid is therefore binding upon this court.

*Was the Approval of Electors to the Contracts Ineffective Because of Claimed Defects in the Notices of the Elections at Which Such Contracts Were Approved?*

The Objectors have claimed at all stages of these proceedings, and the trial court has found in both of the cases now being considered that the elections at which the contracts were approved were invalid because of defects in the notices of those elections. On the prior appeals these contentions were not considered because the contracts were held to be invalid for other reasons. Now that these contracts have been held valid, it becomes necessary to pass upon these contentions.

The first contention of the Objectors with regard to the election notices is that the notices failed to contain any figure as to the amount of money to be expended by the Ivanhoe and Madera Districts with regard to the construction component "payable within or after the term of the contract as to the water delivery works to bring water to the project delivery point." It is urged that such a figure is required in the notice of election by reason of section 23223 of the Water Code. That section reads as follows: "Notice of the election shall contain in addition to the information required in the case of ordinary bond elections a statement of the maximum amount of money to be payable to the United States for construction purposes and cost of water supply and acquisition of property, exclusive of penalties and interest, and a general statement of the property, if any, to be conveyed by the district pursuant to the contract."

In the Ivanhoe case the notice of election contained the following language: "... With reference to the water supply, and in general outline, the contract provides for the water supply for a term of forty years, . . . the United States of America is obligated to deliver and the District required to accept and pay for 7,700 acre feet of Class 1 water, and to the extent the same is available and subject to the limitations and conditions expressed in the contract, Class 2 water not to exceed 7,900 acre feet per year, at the maximum rate of $3.50 per acre foot for Class 1 water and $1.50 per acre foot for Class 2 water, payable in advance, and the annual payment required of the District, exclusive of penalties and interest for such water, cannot exceed $38,700.00, . . . [T]he contract provides for the design and construction of a distribution system providing for delivery of water to each unit of a total of approximately 10,000 acres of irrigable land in the district at a cost not to exceed $1,589,807.00, . . ." The contract itself states: "To the extent that funds may now or hereafter be available by appropriation the United States will expend toward construction of a general distribution and lateral system, surface drainage works, and other related distribution and surface drainage works, all collectively comprising and herein styled the distribution system, a sum not in excess of one million five hundred and eighty-nine thousand eight hundred and seven dollars ($1,589,807), or so much thereof as the contracting officer deems necessary for the completion of the distribution system."

In the Ivanhoe case the trial court found: "That said election notice does not contain a statement of the maximum amount of construction costs to be paid to the United States, . . . as to the portion of the construction costs of the major works of the Central Valley Project used or useful in connection with delivery of water to the plaintiff District and for which the landowners within said District and said District will be called upon to make repayment."

In the Madera case the notice of election contained the following: "That the rates of payment to be made by the District shall be fixed by the contracting officer of the Department of the Interior, not to exceed $3.50 per acre foot for Class 1 water, and $1.50 per acre foot for Class 2 water, payable each year in advance of the delivery of water for such year.

"That the United States agrees to expend toward the construction of a distribution system, from such funds as may be

made available by appropriation, a sum not in excess of $8,320,000.00, or so much thereof as the contracting officer of the Department of the Interior deems expedient or necessary for the construction of the distribution system to each unit of irrigable land, . . .''

The Madera contract provided: ''The contracting officer will, on or before February 15 of each calendar year, by a written notice, announce to the District the rates of payment to be made by the District for all water to be delivered to it pursuant to this contract during the ensuing year, but in no event shall the rates so announced be in excess of three dollars and fifty cents ($3.50) per acre-foot for Class 1 water and one dollar and fifty cents ($1.50) per acre-foot for Class 2 water.''

''To the extent that funds may now or hereafter be available by appropriation the United States will expend toward construction of a general distribution and lateral system, surface drainage works, and other related distribution and surface drainage works, all collectively comprising and herein styled the 'distribution system,' a sum not in excess of eight million three hundred and twenty thousand dollars ($8,320,000), or so much thereof as the contracting officer deems expedient or necessary for the completion of the distribution system.'' ''The District will repay to the United States the actual cost, but in no event in excess of eight million three hundred and twenty thousand dollars ($8,320,000), incurred by the United States in providing the distribution system. The obligation defined in this subarticle shall be referred to hereinafter as the 'construction obligation.' ''

The trial court in the Madera case found that ''said election notice does not state the maximum amount of the construction costs relative to the major works of the Central Valley Project, nor does said notice state the maximum amount to be paid by the District upon said construction costs (apart from said local distribution system as described in Part B of said contract).''

The Objectors attempt to sustain the trial court's findings in both cases on the ground that the provision in section 23223 that ''the maximum amount of money to be payable to the United States for construction purposes and cost of water supply and acquisition of property'' was not complied with in the notice provision.

The trial court and the Objectors misconstrue the requirements of section 23223. The Objectors argue and the trial court necessarily concluded that the words ''money . . .

for construction purposes'' include not only money to be spent by the districts in connection with the construction of the local distribution systems, but also money to be expended by the districts in connection with the construction by the federal government of the central water supply facilities. This construction of the section is incorrect. Under the provisions of the contracts here involved the districts are under no obligation to pay any specific amount for the construction by the federal government of the central water supply facilities, such as the huge dams and reservoirs which will be the source of water with which the federal government will supply the districts. The districts, of course, are obligated to pay a certain amount of money at certain rates for the water the federal government supplies the districts. This amount of money, that is, the ''cost of water supply,'' is required by section 23223 to be included in the notice of election and was so included in both the Madera and Ivanhoe notices of election.

The provision in section 23223 requiring ''money . . . for construction purposes'' to be included in the notice of election necessarily means only that the notice of election contain the amount to be paid by the district to the federal government for the construction of the *local* distribution systems. The electors have no direct interest in the money to be expended for the construction by the federal government of the central water supply facilities, once the maximum rates to be paid for the water to be supplied by the federal government from those facilities is fixed. This is true because of the fact that the cost of the central water supply facilities will not be reimbursed solely by payments made by irrigation districts for water supplied from such facilities. As the Supreme Court of the United States pointed out: ''The Central Valley Project is multi-purpose in nature. That portion of the project expense attributable to navigation, flood control, salinity prevention, recreation and fish and wildlife preservation is non-reimbursable. The remainder of the total expense, and the only part that is reimbursable, is divided between two main sources. The first is hydroelectric power which estimates indicate will be chargeable with over 50 percent of the reimbursable expense, plus interest on the part representing electric plants in service. The other is irrigation, which pays the rest without interest charge. . . . [I]rrigation interests are bearing but a small fraction of the

cost of the water supply facilities. . . .'' (357 U.S. at 295 and 299.)

The cost to the federal government of constructing the central facilities will of course be somewhat of a factor in the determination of the proper rate to be paid by the districts for the supply of water. But, insofar as this is true, the recitation of the ''cost of water supply,'' i.e., the rates to be paid by the district, adequately reflects the districts' share in the expense of constructing the central water supply facilities. A statement of the amount of money to be paid for the construction of the central water supply facilities would thus be a mere repetition of the statement of the ''cost of water supply,'' and as such is unnecessary under section 23223.

The second contention of invalidity in the election notices relates to the findings of the trial court and the argument of Objectors that the maximum amounts for construction as stated in both the Madera and Ivanhoe election notices were false and fraudulent.

In the Ivanhoe case the trial court found ''that the notice of election specifically represented to the voters within said District that a distribution system to each unit of not exceeding 160 acres of land within a total of 10,000 acres of land within said district would be constructed under said contract by the United States at a cost of not to exceed $1,589,807.00, which said cost was to be repaid in 40 equal annual installments without interest. That in truth and fact said notice of election and said proposition as noticed in said notice of election was false and fraudulent and a misrepresentation of the terms and provisions of said contract. . . .''

The above quoted portions of the Ivanhoe notice of election and contract directly controvert the trial court's finding that the notice misrepresented the terms of the contract. The contract stated that a distribution system would be built by the federal government for a maximum of $1,589,807, and the notice of election precisely summarized such provisions.

The argument of Objectors appears to be based on the fact that during the course of the trial below in Ivanhoe the United States and the District renegotiated their contract with the result that the total maximum amount for construction costs was increased from $1,589,807 to $2,276,000. In some way, this is supposed to have constituted a fraud upon the electors.

The circumstances surrounding this change in amount correctly are set forth in the appellant's oral argument on

a motion to file a supplemental complaint. "The supplemental complaint simply recites [the] fact . . . that it [the change in the contract] was needed largely by reason of the economic consequences of the Korean incident; that the estimate upon which the original estimate of cost was based [is] no longer valid. . . . [T]he amendatory contract was authorized by the board of directors; it was approved by the District Securities Commission and *authorized at an election,* and signed, and it now is the contract." (Emphasis added.)

The mere fact that the contract was thus amended is used by the Objectors to support their contention that the contracting parties were in bad faith from the beginning, and never intended the figure in the notice of election to be binding. This contention lacks any merit. Obviously, the contracting parties, whether they be private persons or governmental agencies, by mutual consent have the power and the right to renegotiate and modify the terms of their existing contracts (Civ. Code, § 1698), provided that, if they are governmental agencies, they comply with all the conditions precedent to the validity of their contracts with each other. The amendatory contract here involved did so comply since it had been "authorized at an election." The mere renegotiation and modification of the contract, in the absence of further facts, cannot possibly support the finding of fraud.

Also in support of its conclusion that fraud existed, the trial court found: "The United States now claims that the United States is under no obligation under said contract herein sought to be validated . . . and claims that the United States in the construction of said distribution system . . . may add to and charge in excess of said $1,589,807.00 by such amount and to such extent as the Secretary of Interior may from time to time determine, . . . That said Secretary has now indicated that the additional costs considered by the Secretary to be the costs of such distribution system is, and will be, at least $686,193.00."

This alleged finding was improper. The United States was not a party to the proceedings below, and any of its "claims" were not properly before the court. The duty of the trial court was to determine whether or not the contract was valid and entitled to confirmation. It was not to determine what the various parties claimed were their rights and duties under the contract. Such claims could be settled only by adjudication between the parties themselves. Thus the claims

of parties, especially parties not before the court, were irrelevant.

Apparently this finding was based upon the amendatory contract which Ivanhoe attempted to get before the trial court. If the court simply meant that the United States "claims" that it may renegotiate with the water districts and enter into new contracts subject always to the approval of the voters of the district, the conclusion reached by the trial court was correct. However, such a "claim" under no circumstances could be construed to render the provisions of an original contract "false and fraudulent."

The findings of invalidity based on falsity and fraud in the election notices in the Madera case are equally unsupported. A reading of the above quoted portions of the notice of election and the contracts in the Madera case demonstrates that the notice of election accurately summarized the contract provisions relating to the maximum cost of construction for the distribution system.

The Objectors' argument that the maximum amounts in the election notice were false and fraudulent is based on grounds similar to those raised in the Ivanhoe case. The Objectors cite the testimony of certain directors of the Madera district for the proposition that "after the election the board of directors of the Madera District passed a resolution to satisfy the Bureau of Reclamation that the district would pay the increase over the $8,320,000 whatever it might be." The cited testimony does not establish that the Madera Board of Directors passed such a resolution at the behest of the Bureau of Reclamation. The witness did testify that there had been discussions with the Bureau of Reclamation with regard to a possible increase in the maximum construction cost, but that any such resolution or proposition would "have to go back to the people."

What was said with relation to the "falsity" of the Ivanhoe election notice is applicable here. The public parties to these contracts have a right to renegotiate and modify the provisions of existing contracts, so long as they comply with conditions precedent to the contracts' validity, such as submitting the modifications to a vote of the electors within the district. It appears from the cited testimony that during the course of the trial of the Madera case the district and the Bureau of Reclamation were in the process of such renegotiation. This fact does not render the original contract and proceedings leading thereto invalid. There is no contention

that the *district and the Bureau of Reclamation* attempted to incorporate new terms in the contract without the approval of the voters of the district; in fact the contrary appears: "[W]e talk it over and then pass a Resolution that we will try to see a thing through, just like anything else, *it still has to go back to the people.*" (R.T. 149.)

The trial court also found that "said election notice is ambiguous, indefinite and uncertain, in that it cannot be ascertained therefrom, whether the United States will construct a distribution system of each unit of 160 acres of irrigable land within the District for the sum of $8,320,000.00 or whether the United States will expend the sum of $8,320,000.00 for the construction of a partial distribution system." A reading of the notice of election illustrates that this is based on a misconstruction of the notice. The notice provides: "[T]he United States agrees to expend toward the construction of a distribution system, from such funds as may be made available by appropriation, a sum not in excess of $8,320,000.00, or so much thereof as the contracting officer of the Department of the Interior deems expedient or necessary for the construction of the distribution system to each unit of irrigable land, no unit comprising more than 160 acres of land, . . . That the *district* shall assume the operation and maintenance of the distribution system; that the District will repay to the United States the actual cost, but in no event in excess of $8,320,000.00, incurred by the United States in providing the distribution system; . . ." The plain meaning of this language is that the United States will build a distribution system for a maximum cost of $8,320,000. This is precisely in accord with the contract: "To the extent that funds may now or hereafter be available by appropriation the United States will expend toward construction of a general distribution and lateral system, surface drainage works, and other related distribution and surface drainage works, all collectively comprising and herein styled the 'distribution system,' a sum not in excess of eight million three hundred and twenty thousand dollars ($8,320,000), or so much thereof as the contracting officer deems expedient or necessary for the completion of the distribution system." It is also stated: "The District will repay to the United States the actual cost, but in no event in excess of eight million three hundred and twenty thousand dollars ($8,320,000), incurred by the United States in providing the distribution system."

The Objectors raise other arguments, and the trial

court made other findings, with regard to the asserted invalidity of the Madera election. These findings relate to certain newspaper reports allegedly published at the behest of the district's board of directors. The trial court found: "The Board of Directors of Madera Irrigation District caused to be published in the Madera Daily News Tribune false and misleading statements concerning the provisions of the contract in respect to the completion of a distribution system to each 160 acres of land by the United States for the sum of $8,320,000.00 or less; said statements influenced the voters of said District at said election, and the true results cannot be ascertained by reason of said false and misleading statements.

"There was represented to said voters by means of said newspaper advertisement and said purported notice of election that the design and construction of said distribution system would provide a system for the delivery of water to each unit of not more that [*sic*] 160 acres of irrigable land within the District at a cost to the District of not to exceed $8,320,000.00 . . . The United States now claims that the United States is under no obligation under said contract herein sought to be validated to construct a complete distribution system to each unit of 160 acres of irrigable land within the District boundaries for said sum of $8,320,000.00. There has been represented to the Board of Directors of said District that said distribution system would cost in excess of $12,000,000.00 and that the total cost thereof over and above said $12,000,000.00 is unknown."

What the United States "claims" it is obligated to do under the contract has already been held to be irrelevant to a determination of the validity of the instant contract. There can be no doubt that the United States and the districts may renegotiate and modify their existing contracts subject to the approval of the voters within the district. Such renegotiation cannot be the basis of a finding of fraud, or a basis for a finding that what appeared in the existing contracts were false statements. According to the trial court's findings, the newspaper notices published at the behest of the Madera District's Board of Directors appear to conform to the information as set forth in the notice of election. In this regard, it has already been shown that the notice of election was an accurate summary of the contract. It follows that the findings of the trial court that the newspaper notices were false and misleading are unsupported.

The final contention of Objectors with regard to the Madera election is that the notice of election did not describe district property that it would necessarily have to convey to the United States. Because of this fact, it is argued, the notice of election is defective under Water Code, section 23223, which reads: "Notice of the election shall contain . . . a general statement of the property, if any, to be conveyed by the district *pursuant to the contract.*" (Emphasis added.) The trial court found that the notice of election was defective in this respect and that "at the time of the publication of said notice, Madera Irrigation District was and now is the owner of certain lands and easements in land connected with the water distribution system then and now in existence, known as the Emmert System; that at the time of publishing of said notice, it was and now is the plan and intention of the Board of Directors of Madera Irrigation District and said Madera Irrigation District, to convey to the United States a fee simple title to said lands and the perpetual easements owned by it in connection with the said Emmert System; that by its terms the purported contract marked exhibit 'A' and before this court for validation, requires that upon request of the contracting officer, Madera Irrigation District must convey to the United States, without cost, the unemcumbered [*sic*] fee simple title to all lands owned by it, or perpetual easements therein, required for right of way purposes for the distribution system; that the Emmert System is a portion of the distribution system to be constructed, repaired and enlarged by the United States pursuant to the plan of the distribution system agreed upon by the District and the United States; that the fee title to lands underlying the ditches of the Emmert System or the rights of way or easements owned in connection therewith, were not stated in said election notice as property to be transferred to the United States pursuant to the purported contract marked Exhibit 'A' and before this court for validation."

The notice was undoubtedly defective in this respect. But this, alone, is not sufficient grounds to overturn the election. From the tenor of the contract, and from the very nature of the project itself it can be assumed, reasonably, that the voting public knew that lands would have to be conveyed by the district to the federal government in order to consummate the project. Thus, the defect was a minor one and may be disregarded.

It must be remembered that in both elections the approval of the contracts won by substantial majorities. Once the voters express their approval in an election it would take a most serious error to justify a court in upsetting that election. As was said in *Simpson* v. *City of Los Angeles,* 40 Cal. 2d 271, 277 [253 P.2d 464]: "Courts are reluctant to defeat a fair expression of popular will in elections and will not do so unless required by the plain mandate of the law. [Citing three cases.]" This sensible principle is expressly made applicable to elections for the approval of contracts between irrigation districts and the federal government. Section 23221 of the Water Code makes applicable to such elections the various provisions of the law relating to elections for the issuance of district bonds. Section 22678 of the Water Code, one of the included sections, provides: "In a contest provided for by this article the court shall disregard any irregularity or omission which does not affect the substantial rights of the parties."

It is also a general rule applicable to claimed defects in notices of election that any errors or defects therein will not invalidate an election unless there is some showing that the electors were, in fact, misled by such defects (*People* v. *Prewett,* 124 Cal. 7 [56 P. 619]; *People* v. *City of Carlsbad,* 128 Cal.App.2d 77, 83 [274 P.2d 740]; 17 Cal.Jur.2d p. 293, § 45; see also *Anselmi* v. *City of Rock Springs,* 53 Wyo. 223 [80 P.2d 419, 116 A.L.R. 1250]). In neither the Ivanhoe nor Madera case was there any showing that the voters were in fact misled by any of the claimed errors.

The Confirmers also urge that because the electors in subsequent elections approved modifications of the contracts they ratified the contracts under consideration. It is urged that this precludes any attack on the election procedure in the first election. This contention cannot now be considered because none of the election proceedings in the elections approving modification of the contracts are now before this court.

The Confirmers also contend that none of the Objectors legally may attack the election proceedings because the record does not show that any Objector is a qualified voter within the districts involved. We place no reliance on this contention. The record amply shows that those contracts, if confirmed, will substantially affect the properties of the Objectors. This being so, they should be able to object to the electoral approval of the contracts on proper grounds (*Cf.*

*Santa Barbara etc. Agency* v. *All Persons,* 47 Cal.2d 699, 711 [306 P.2d 875]).

For the foregoing reasons we hold that the record does not show any fraud or any defects in the notice of elections sufficient to invalidate the elections in the Ivanhoe and Madera cases. The findings to the contrary are unsupported.

The United States Supreme Court was only asked to review and it did review only those portions of the prior opinions of this court that had held the contracts to be invalid. No review was sought or given to several holdings in the prior opinions to the effect that several provisions of the contracts were valid.

Thus in the Ivanhoe case (47 Cal.2d 597) at page 646 it was stated:

"It is claimed that article 26 of the contract purports to condition the delivery of water to a landowner otherwise entitled to delivery, upon the payment by him of any assessment levied although it has been judicially declared to be a void assessment. It seems unusual that a party should, except under compulsion, contract to pay an assessment declared to be void by a court of competent jurisdiction. But when taken as a reasonable and additional assurance of reimbursements to the United States for expenditures incurred on behalf of the district and to cover operating expenses in furnishing water to the district, it may be deemed a legitimate subject of contract." And at page 647 this court stated:[5]

"The trial court in its findings of fact and conclusions of law declared the contract to be invalid on numerous additional grounds not carried into the judgment. Conclusions that the contract is uncertain, lacks mutuality, improperly delegates powers to the Secretary of the Interior, improperly prevents changes in the boundaries of the district, provides unreasonable security measures to the United States and other conclusions not necessary to the judgment are insufficiently supported when considered in connection with the views herein expressed as to the terms under which the parties may properly contract."

These holdings are applicable to both cases under consideration. They are the law of the case, are correct and are reaffirmed.

In the Madera case this court made two holdings particularly applicable to the facts of that case. No review of these points were asked of or given by the United States Su-

[5]For comparable rulings in the Madera case, see 47 Cal.2d at page 694.

preme Court. They are that the filing of an application to appropriate by the district created no vested rights to the water in the applicant or in the landowners of the district (47 Cal.2d at pp. 688, 689, 691), and that the owners of lands properly excluded from the district have no rights attached to their lands that can serve as a basis to assert the invalidity of the contract (47 Cal.2d at p. 691). These holdings, too, are the law of the case, are correct and are reaffirmed.

For the foregoing reasons it is apparent that the judgments in the Ivanhoe and Madera cases must be reversed. It is so ordered, with instructions to the trial court to modify its findings of fact and conclusions of law and to enter judgments in the two cases in accordance with the views herein expressed.

Gibson, C. J., Traynor, J., and White, J., concurred.

SCHAUER, J., SPENCE, J., and McCOMB, J.—We concur in the judgments.

While we disagree with many of the statements made in the majority opinion, we see no escape from the main conclusions reached with respect to the validity of the contracts in question, in view of the decision of the United States Supreme Court. (*Ivanhoe Irr. Dist.* v. *McCracken*, 357 U.S. 275 [78 S.Ct. 1174, 2 L.Ed.2d 1313].) We do agree with the statement in the majority opinion that ". . . it is now obvious that the question of title to the water is not involved." This statement of the majority might well have been broadened, as it appears clear that neither the "question of title to the water" nor the question of the capacity in which any title to the water may be held need be discussed here. If the majority's statement had been so broadened, the necessity for much of the majority's lengthy discussion with which we cannot agree would have been eliminated. Being in agreement, however, with the majority's main conclusions above mentioned as well as the majority's conclusions with respect to the validity of the elections by which the contracts in question were approved by the electors, we concur in the majority's reversals with directions of the judgments in the above-entitled cases.