[Civ. No. 26597. Second Dist., Div. Two. Nov. 27, 1962.]

SANFORD E. ADAY et al., Petitioners, v. MUNICIPAL
COURT FOR THE BURBANK JUDICIAL DISTRICT
OF LOS ANGELES COUNTY et al., Respondents; THE
PEOPLE, Real Party in Interest.

Brock & Fleishman and Stanley Fleishman for Petitioners.

Harold W. Kennedy, County Counsel, Donald K. Byrne, Deputy County Counsel, Samuel Gorlick, City Attorney, James J. Clancy, Assistant City Attorney, William B. Mc-Kesson, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Respondents and Real Party in Interest.

ASHBURN, J.—Petitioners, Sanford E. Aday et al., seek mandamus requiring the return to them of all books, magazines, papers, records, office supplies and other items of property which were taken from them after an unlawful search and seizure which occurred at their place of business, Number 2823 North Lima Street, Burbank, California, on March 15, 1961. That the search and seizure was unlawful cannot be gainsaid. They were wholly inconsistent with that concept

of "ordered liberty"[1] which is inherent in our national foundations and necessary to their continued life.

Curiously, petitioners do not tell us what their business is or was[2] but the affidavit of Sergeant Robert J. Steckbauer of the Burbank police force, upon which a search warrant was issued, avers that petitioners were engaged in publishing and distributing lewd and obscene pictures and books at said Burbank address and the search warrant contains substantially the same language.

The search warrant was issued by Honorable Archie L. Walters, Judge of the Municipal Court of the Burbank Judicial District, on March 15, 1961, and purported to authorize search for and seizure of "(1) Photographs depicting males and females in obscene poses and prints and negatives of the same; (2) Books and magazines, including 'Sex Life of a Cop,' also known as '10:04 Sgt. Thorne,' and 'Joy Killer,' but not limited thereto; (3) Contracts of employment between the aforesaid Sanford E. Aday, also known as Les Aday; Reba Chamberlain, Jack Shulem and Harold Shulem; (4) Agreements of purchase and sale between the aforenamed parties; (5) Documents evidencing the shipment of the aforesaid books and photographs, including bills of lading and other shipping records; (6) Cuts, molds and plates of the aforesaid obscene photographs and books; (7) Sales records and purchase records of said books and photographs",— "which articles, writing and property constitute evidence tending to show that a felony has been committed."

On said March 15, at about 8:15 p.m., Burbank police officers (accompanied by a deputy district attorney of Alameda County) forcibly and violently effected an entrance into petitioners' said premises and "engaged in a general rummaging, ransacking and exploratory search of the premises which consumed from about 8:15 p.m. on Wednesday, March 18, 1961 [March 15], to the early morning hours of Saturday, March 18, 1961, the business of the petitioners being in the meantime entirely shut down, a cordon of police being placed

---

[1]To use the phrase of Mr. Justice Cardozo found in *Palko* v. *State of Connecticut*, 302 U.S. 319, 325 [58 S.Ct. 149, 82 L.Ed. 288].

[2]In the petition for mandate filed in the Superior Court of Los Angeles County (later discussed here), petitioners did allege that "The petitioners herein are engaged in the publication and national distribution of books and other writings protected from governmental abridgment and suppression by the free speech and press provisions of article I, § 9 of the California Constitution and the First and Fourteenth Amendments to the United States Constitution."

around the building, and access to the premises prevented by the said police. Commencing about 2.00 p. m. on Friday, March 17, 1961 until the early morning hours of March 18, 1961, the said police officers, in various trucks, removed from petitioners' premises about 400,000 books, writings, unopened mail, sealed packages, cartons, bank statements, checks, bills of lading, employees' work records, labels, rubber stamps and other similar papers, things and effects on the said premises. An inventory of the material taken was executed by the police officers, the said inventory being prefaced with the following statement: 'To Whom it May Concern: The following material was removed for purposes of evidence pursuant to the attached search warrant executed March 15, 1961.' " The officers "while on the premises during the search as aforestated, divided the various titles of different books in the premises, some sixty-two in number, among themselves for reading purposes, each officer taking some 10 to 12 books, and from about 6 :30 p. m. on March 16, 1961 to about 1 :30 a. m. on Friday, March 17, 1961, a period of some seven hours, the said police officers read the different books, and 'ruled' whether each book was obscene or not.'' They ruled 31 titles to be "not pornographic" but took a copy of each from the premises. The books and other material which they ruled to be pornographic were also seized and removed as shown by the inventory which they furnished to petitioners—approximately 2,089 cases and 1,772 loose books; also "magazines, stamps, layouts, glue presses, negatives, letters, invoices, bills of lading, collection records, inventory notebooks, envelopes, name stamps, lists of customers, check books, checks, shipping stickers, bank books and similar papers, records and effects.''

Petitioners promptly entered a traverse controverting the grounds on which the warrant was issued (Pen. Code, § 1539), and moved for a return of all seized articles. After a hearing Judge Walters, on April 24, denied their motion for restoration except as to certain items which had been returned during the proceeding pursuant to stipulation. All this occurred shortly before the Supreme Court's decision in *Aday* v. *Superior Court*, 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47], filed on May 11, 1961.

That proceeding grew out of an Alameda search warrant and a search of September 16, 1960. The affidavit for the warrant, made by police office Ryken, alleged conspiracy to publish, print and sell " 'obscene and indecent writings,

papers and books, to wit, "10:04 Sgt. Thorne," also known as "Sex Life of a Cop," and "Joy Killer," among others' (Pen. Code, §§ 182, 311, subd. 3.)" Copies of those two books were attached and the officer-affiant averred he had purchased them in Hayward. The affidavit also stated on information and belief that petitioners had possession upon the described premises of articles which were used as a means of committing a felony, such as checks, check stubs, check books, bank statements, sales records, purchase records, customers' orders, customers' correspondence, invoices, bills, vouchers, general ledgers, cash receivable ledgers, cash disbursement ledgers, mailing list. Also: "Books and magazines, including 'Sex Life of a Cop' also known as '10:04 Sgt. Thorne,' and 'Joy Killer,' but not limited thereto." "Any and all other records and paraphernalia connected with the business of the corporate petitioners." The affidavit was presented to Hon. Dan B. Eymann, Judge of Municipal Court for Fresno Judicial District.

"Judge Eymann, after reading portions of the two named books, issued a warrant reciting that proof had been made by Ryken's affidavit that petitioners had conspired as alleged and that the 19 categories of property described in the affidavit (which were set forth in the warrant) were used by petitioners as a means of committing the felony. The warrant stated that there was probable cause to believe that the proscribed property was concealed upon the persons of the individual petitioners and the premises at two Fresno addresses . . . and it commanded that the executing officers search these persons and premises for the property." (*Aday*, at pp. 793-794.)

Pursuant to this warrant the officers conducted an eight-hour search of the premises and seized thousands of copies of the two books named in the affidavit plus sample copies of more than 50 other books as well as certain photographs and magazines. "A great variety of papers and records were seized including orders, invoices, letters, checks and a checkbook, savings account book, articles of incorporation, ledgers, manuscripts, blank tax returns, and lists of dealers, news agencies and accounts." (*Aday*, p. 794.) The seized articles were lodged in the Fresno jail. Petitioners filed a traverse and motion for return of the property but during a recess in that hearing, Judge Snook of Alameda County Superior Court made an order directing that the seized property be brought to Alameda County for presentation to the grand jury. Later, upon conclusion of the hearing under Penal Code section 1539,

the magistrate held the warrant to be valid and the owners sought and obtained mandamus from the Supreme Court.

In granting the peremptory writ that court said in part at page 795: "Article I, section 19, of the California Constitution reads: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.' Section 1525 of the Penal Code provides: 'A search-warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched.' (See also Pen. Code, § 1529 [requiring 'reasonable particularity' of description].)

"Aside from the reference to copies of the 1959 federal and state income tax returns of petitioners and the naming of the two books attached to the affidavit, the description in the warrant before us consisted of a number of broad, general categories, the last of which embraced 'any and all other records and paraphernalia' connected with the business of the corporate petitioners. Articles of the type listed in general terms in the warrant are ordinarily innocuous and are not necessarily connected with a crime. The various categories, when taken together, were so sweeping as to include virtually all personal business property on the premises and placed no meaningful restriction on the things to be seized. Such a warrant is similar to the general warrant permitting unlimited search, which has long been condemned. (See *People* v. *Berger,* 44 Cal.2d 459, 461 [282 P.2d 509].) . . . The warrant in the present case did not comply with that requirement [specificity] except with regard to the 1959 income tax returns and the two named books, and therefore it did not constitute legal authorization to search for and seize the articles that were insufficiently described." At page 800 [55 Cal.2d] "The warrant constituted valid authorization for the search and seizure with respect to the named books but not with respect to the other property referred to in the warrant. It should be noted, however, that if any of the property seized other than the named books was contraband, petitioners are not entitled to its return. (*Steele* v. *United States,* No. 1, 267 U.S. 498, 503, 505 [45 S.Ct. 414, 69 L.Ed. 757]; *United States* v. *Old Dominion Warehouse, Inc.,* 10 F.2d 736, 737-738.) Any property in possession of petitioners in violation of section 311 of the Penal

Code was, of course, contraband. The seized property other than the named books is not before us, and, although much of it obviously was not contraband, it may be that some of it was. We are therefore unable to determine whether all the property other than the named books must be returned to petitioners or whether some of it is to be withheld. Additional proceedings will be necessary in order to make that determination, and they should be had in the municipal court in Fresno. . . . Under the circumstances present here, the action of respondent superior court was improper; it cannot be reconciled with orderly procedure and was not authorized by the code provisions applicable to searches and seizures made under a warrant. (Pen. Code, §§ 1523-1542.) The purpose of sections 1539 and 1540 is to provide one whose property is seized with a speedy remedy in a readily accessible court, and that purpose may be frustrated by removal of seized property to another county during the pendency of the proceedings provided for in those sections. The irregularity in procedure, however, did not operate retroactively to affect the validity of the search and seizure and has no bearing on our decision concerning return of seized property.

"Let a peremptory writ of mandate issue directing respondent court to return all the seized property, except the copies of the books named in the warrant, to the Municipal Court for the Fresno Judicial District for further proceedings in accordance with the views expressed in this opinion."

After this ruling was made petitioners in the instant proceeding filed in the Los Angeles Superior Court a petition for a writ of mandate alleging facts substantially as set forth in the petition now before us and praying mandate requiring respondents (the Municipal Court for the Burbank District, Judge Walters, the Burbank Chief of Police, Sergeant Steckbauer, the City Attorney of Burbank and the District Attorney of Los Angeles County) to cause to be returned to petitioners all the property taken from them under the search warrant, as described in the inventory. The matter was heard by Judge A. Curtis Smith who, on August 11, 1961, held that "the search warrant . . . was a general warrant and failed to comply with the requirements of reasonable particularity of description in violation of Article I, § 19 of the California Constitution except for the reference therein to the books *Joy Killer* and *Sex Life of a Cop* . . ." and was therefore invalid with respect to all items except the two named books. Judge Smith issued a peremptory writ directed to respondents to

"deliver forthwith to petitioners all property of whatever kind or nature seized from petitioners" except certain specified paper back books (about 60 in number) and that said excepted items be returned to the Burbank Municipal Court "for further proceedings in accordance with the opinion of the California Supreme Court in *Aday* v. *Superior Court of Alameda County,* 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47]." Also "IT IS FURTHER ORDERED that respondents may retain all copies of the paper back book *Joy Killer* without further proceedings." No appeal was taken from this judgment and it thereby became res judicata as to matters actually adjudged therein (29 Cal.Jur.2d § 225, p. 179). But nothing was returned to petitioners as had been ordered.

The matter came on for further hearing before Judge Walters on November 3 and December 15, 1961. Counsel for these petitioners advised the judge of the recent decision in *Aday, supra;* also of *In re Harris,* 56 Cal.2d 879 [16 Cal.Rptr. 889, 366 P.2d 305] (which holds that refusal to hear proofs on the question of whether the seized writings are obscene is a denial of due process) ;[3] *Marcus* v. *Search Warrant of Property,* 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127] (later discussed herein) and *Mapp* v. *Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (which holds the question of unlawful search and seizure to be a federal constitutional question, not controllable by any state rule of evidence). Counsel also advised the court of the fact (as they now aver) that after the *Aday* decision of our Supreme Court the Alameda indictment based upon the seized documents was dismissed and seized property returned. Counsel also repeatedly sought to prove that none of the seized items was obscene according to contemporary community standards (*Aday* v. *Superior Court, supra,* 55 Cal.2d at p. 798), but the proof was excluded. The petition herein avers and there is no denial of the allegations that at the hearing of the traverse proceeding Judge Walters "also refused to read or adjudge whether or not the books and writings seized by the police officers were in fact obscene . . . and refused petitioners all opportunity to offer evidence to establish that the books and writings were in fact not obscene.

[3] Mr. Justice Traynor, concurring, says in a footnote on page 883: "Such a seizure suggests, at least, that its purpose was not to secure evidence of 'intent or notice' with respect to the two specific publications alleged to be obscene, but to punish petitioner for his alleged crimes without a trial by putting him out of business. Neither that punishment nor the procedure followed is a permissible means of enforcing Penal Code section 311."

. . . Throughout all the restoration proceedings, the respondent Municipal Court was informed again and again by petitioners that at the very least the petitioners must be allowed to prove that each of the writings were not, according to contemporary community standards, obscene, and petitioners constantly offered to introduce such evidence. . . .'' By way of concluding the discussion of the matter the magistrate said: ''In other words, the Court is proceeding now with the idea of reading the books to determine whether any books should be released, not to determine whether or not the book is presently contraband but only whether it shall be released.'' This was on December 15, 1961. On April 5, 1962, the judge made an order directing restoration of the titles found by the police to be not pornographic (31 in number), same being also found by him to be not contraband. The titles found by the police to be pornographic, having been read by the magistrate, were found (without the aid of the proffered evidence) to be obscene and contraband (30 in number); of course none of them was ordered restored to petitioners; but they never did receive any portion of those items which were ordered returned.

Thereafter on April 25 the municipal court made an order directing that all books previously held by the court to be not obscene, instead of being returned to petitioners, should be delivered by the clerk of that court ''to the custody of the county clerk.'' This order recites that it was made pursuant to an order of the superior court of November 30, 1961. Petitioners had no notice or knowledge of any occasion for or a making of such Superior Court order and first learned its contents on May 25, 1962. It had been procured by the city attorney of Burbank without notice to Judge Smith or petitioners. That order recites that the specified books had been offered as Exhibit 48 before the grand jury in the matter of *People* v. *Aday et al.* and ordered that same be released from custody of the county clerk and delivered to the clerk of the Burbank Municipal Court to be there held until determination of the proceedings in that court and then to be returned to the custody of the county clerk. The name of the judge who made this order is not given but it is of doubtful validity as an attempted modification by another judge of an order made by Judge Smith in a matter still pending before him. (See *Williams* v. *Superior Court,* 14 Cal.2d 656, 662 [96 P.2d 334]; *People* v. *Wong Bin,* 139 Cal. 60, 63 [72 P. 505].[4] And so the

---

[4]This matter was still pending before Judge Smith for a peremptory writ is required by section 1087, Code of Civil Procedure to have a return

specific books have never been delivered to petitioners though consistently held to be not obscene, nor have any of those claimed to be pornographic been returned although 18 months have elapsed since their seizure on March 18, 1961.

It further appears from the file in *Aday* v. *Superior Court*, 2nd Civil Number 26447 (of which we take judicial notice herein), that on April 25, 1961, petitioners had been indicted in Los Angeles County for conspiracy to prepare and deal in obscene and indecent books, etc., and that on April 27, *1962*, a motion to set aside the indictment, pursuant to section 995, Penal Code, was made and denied. The argument of said matter followed by two days the municipal court's order of April 25th above mentioned, and the petition herein says that the prosecutor relied heavily in his argument "on the Municipal Court ruling which arrived so fortuitously, . . . in the Superior Court virtually on the eve of the motion to set aside the indictment." Petitioners thereupon filed on May 11, 1962, pursuant to section 999a, Penal Code, a petition for prohibition seeking to restrain any further proceedings under the indictment. Division I of this court denied the petition without comment. As shown above, numerous items of seized property were used before the grand jury and probably had a persuasive influence upon that body, but an examination of the record presented upon the prohibition proceeding indicates that the denial of that writ adjudicated nothing, except that the court considered that that particular petition did not show good cause for a writ; it suggests the inference that the court found sufficient evidence other than the seized materials, to sustain an indictment, perhaps upon the theory expressed in *Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183 [281 P.2d 250] : "An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." That ruling raises no bar to the instant proceeding. (*McDonough* v. *Garrison*, 68

day inserted in it. The customary form is set forth in Deering's Annotated Civil Procedure following section 1087 and it reads: "Now, therefore, we, being willing that speedy justice should be done in this behalf to the said petitioner, do command you to ——; and we do also command that you make known to us before our Court, at ——, on ——, at —— o'clock ——m. of said day, or as soon thereafter as counsel can be heard, how you have executed this writ, and have you then and there this writ." True, the writ was defective in that the return date had been omitted but that was a mere ministerial matter which could have been corrected ex parte at any time.

Cal.App.2d 318, 324 [156 P.2d 983]; *Confidential, Inc.* v. *Superior Court,* 157 Cal.App.2d 75, 78 [320 P.2d 546]; *People* v. *Pipes,* 179 Cal.App.2d 547, 551-552 [3 Cal.Rptr. 814].)

Application of the principles announced in *Aday* v. *Superior Court, supra,* requires a holding that the search warrant now under consideration was invalid except as to the two books named in it; that the search which exceeded the broad terms of the warrant was unlawful *pro tanto* even if the warrant were deemed valid. However, our Supreme Court ruled in that case that the warrant was severable (p. 797) and that "if any of the property seized other than the named books was contraband, petitioners are not entitled to its return" (p. 800); that if there was probable cause to believe that the named books were used or intended to be used as a means of committing the alleged offense all copies could be seized subject to the owners' right to litigate the issue of obscenity before their being used against him; "[t]he seizure of all copies of an allegedly obscene book is not invalid if made on probable cause and if the owner of the book had adequate remedies by which to litigate the issue of obscenity" (p. 799); that the proceeding under sections 1539-1540, Penal Code, may prove adequate protection to the owners and if not, a final determination may be had in the criminal proceedings or through mandamus (p. 799); "[t]hese various remedies satisfy the requirements of due process, and the taking of all copies of the named books did not violate freedom of speech and press" (p. 800). It was held also that, although the warrant in question was valid authority for seizing the two named books, other property seized should be returned to the owners if found not obscene but not returned if found to be contraband. As the seized property other than the two books was not before the Supreme Court, it held that further proceedings to determine whether same was contraband should be had and that they should be in the municipal court where the traverse proceeding was pending. So the respondent court (Superior Court of Alameda County) was directed to return all seized property, except the two books named in the warrant, to the municipal court for further proceedings.

Petitioners at bar contend that they are entitled to restoration of all of the seized property without any further inquiry as to its character and that this is required by the decision in *Marcus* v. *Search Warrant of Property, supra,* 367 U.S. 717, which held essentially that under the facts there presented all seized books, etc., whether contraband or

not, should be returned to the owners because of the general exploratory search in which they had been found, because of the invalidity of a search warrant authorizing unrestrained access to defendants' books, papers and other possessions and because of failure to afford the owners a court hearing with prompt determination of the question of whether the seized articles were obscene,—were contraband. ▇ Of course the *Marcus* case, to any extent to which it conflicts with *Aday, supra,* upon this constitutional problem, must control; state courts must fall into line (*Mapp* v. *Ohio, supra,* 367 U.S. 643; *Elkins* v. *United States,* 364 U.S. 206, 224 [80 S. Ct. 1437, 1453, 4 L.Ed.2d 1669]; *People* v. *Yahne,* 195 Cal. 683, 685 [235 P. 50]; *Ivanhoe Irr. Dist.* v. *All Parties,* 53 Cal.2d 692, 709, 715 [3 Cal.Rptr. 317, 350 P.2d 69]; 21 C.J.S., § 206, pp. 365-366.)

Before reviewing the *Marcus* case we deem it appropriate to refer to *People* v. *Municipal Court,* No. S.F. 20966 on the records of the Supreme Court. The State there sought mandamus to compel the municipal court of the Fresno district to determine whether the respective items ordered sent back to it by the last paragraph of *Aday* v. *Superior Court, supra,* 55 Cal.2d page 800, were contraband because obscene. The petition alleged that the municipal court, without complying with the mandate of the Supreme Court "and without reading or making any determination whatsoever as to the obscenity of the approximately fifty (50) books returned to it for that purpose, ordered their return to the persons from whom they were seized;" also that the municipal court has refused to comply with the Supreme Court mandate. The petition was denied without comment. It appears, however, that the opinion of the municipal judge was attached to the petition and referred to the *Marcus* case, saying in part: "If some of the items seized turn out to be of obscene nature this does not correct the wrongful taking. For the foregoing reasons, this Court rules that all these paper back novels were seized unlawfully." As the propriety of the return of all seized items was the only point involved, the ruling denying the petition would seem to imply that our Supreme Court recognized the controlling authority of the *Marcus* case. ▇ Speaking of a denial of petition for hearing in Supreme Court after decision of District Court of Appeal, it is said in *DiGenova* v. *State Board of Education,* 57 Cal.2d 167, 178 [18 Cal.Rptr. 369, 367 P.2d 865]: "Although the court's

denial of a hearing is not to be regarded as expressing approval of the proposition of law set forth in an opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of this court [citations], it does not follow that such a denial is without significance as to our views." That view seems equally appropriate here.

The *Marcus* case arose upon an appeal from the Missouri Supreme Court and grew out of a search warrant based upon an affidavit of Police Lieutenant Coughlin saying that of his own knowledge appellants "kept for the purpose of sale obscene publications" at certain named places of business, attaching a list of magazines. No copy of any of the magazines was submitted but a circuit judge issued search warrants authorizing searches of the premises and seizure of obscene materials. "[A]ny peace officer in the State of Missouri . . . [to] search the said premises . . . within 10 days after the issuance of this warrant by day or night, and . . . seize . . . [obscene materials] and take same into your possession . . . ." (367 U.S. 717, 722.) Enforcement officers executed the warrants. Appellant's stock of magazines ran into hundreds of thousands. The officers did not confine themselves to the Coughlin original list but seized all magazines and other publications which in their respective judgments were obscene. After three hours of search these magazines etc. were hauled away in trucks, approximately 11,000 copies of 280 publications, magazines, books and photographs. The Missouri procedure provided no hearing to the owner of the property in advance of seizure, but the judge issuing the warrant was required to fix a date not less than 5 nor more than 20 days after the seizure for a hearing to determine whether the seized material was obscene. The owner could appear at the hearing and defend the charge. In the *Marcus* case the circuit judge fixed a date for the hearing and in connection with motions for restoration of the property "heard testimony of the police officers concerning the events surrounding the issuance and execution of the several warrants." (P. 724.) This hearing was held on or about October 23, 1957, and the ruling was made on December 12, 1957. The judge found that 100 of the 280 seized items were obscene, overruled the motions, but ordered the 180 nonobscene items returned to the owners; these items were withheld from the owners for over two months. Of course the Supreme Court roundly condemned such conduct as denial of due process.

The validity of the Missouri statute was not passed upon

(see, p. 723, footnote 9) nor did the Supreme Court of the United States determine whether the seized publications were obscene (p. 738). It did hold that the search and seizure were so conducted as to deny to the owners procedural due process of law. Four phases of the matter are emphasized in the opinion: (1) There was no preliminary judicial determination of the question whether the respective items were obscene; that matter was left entirely to enforcement officers; (2) the warrant was so broad as to sanction a general exploratory search for contraband; (3) the search exceeded the broad terms of the search warrant, and (4) such a search, seizure and sequestration of seized properties amounts to a prior restraint upon free speech and press. The combination of these factors resulted in a mass seizure ''effected without any safeguards to protect legitimate expression'' and ''[s]ince a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights the judgment [was] reversed and the cause [was] remanded for further proceedings not inconsistent with this opinion.'' (P. 738.)

Concerning the exploratory scope of the search the court said, at page 724: ''The use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new. Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power.'' At page 728: ''Enforcement through general warrants was finally judicially condemned in England. This was the consequence of the struggle of the 1760's between the Crown and the opposition press led by John Wilkes, author and editor of the North Briton.'' At page 729: ''The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise that power.'' Concerning the matter of exploratory searches, see also, *People* v. *Mills*, 148 Cal.App.2d 392, 399-403 [306 P.2d 1005]; *People* v. *Berger*, 44 Cal.2d 459, 461 [282 P.2d 509]; *Bielicki* v. *Superior Court*, 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288], and *Britt* v. *Superior Court*, 58 Cal.2d 469, 471 [24 Cal.Rptr. 849, 374 P.2d 817].[5]

---

[5]79 C.J.S. § 93, page 913: ''It is a general rule that contraband, or property the possession of which is illegal, cannot be returned to accused

244

In the ordinary run of cases contraband is easily identified as such by the ordinary observer, e.g., intoxicating liquor, marijuana, heroin, gambling paraphernalia. But in this "preferred" area of speech and free press,[6] rough and ready processes will not suffice. ▮▮▮ Usually one charged with distribution of obscenity raises the issue that his material is art not filth; he is entitled to a decision thereon, and as a matter of due process is entitled to a hearing on that issue before his material can be classified or treated as contraband. On this particular point the *Marcus* opinion says: "The Missouri Supreme Court's assimilation of obscene literature to gambling paraphernalia or other contraband for purposes of search and seizure does not therefore answer the appellants' constitutional claim, but merely restates the issue whether obscenity may be treated in the same way. The authority to the police officers under the warrants issued in this case, broadly to seize 'obscene . . . publications,' poses problems not raised by the warrants to seize 'gambling implements' and 'all intoxicating liquors' involved in the cases cited by the Missouri Supreme Court. 334 S.W.2d, at 125. For the use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications. '. . . [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools. . . .' *Speiser* v. *Randall*, 357 U.S. 513, 525 [78 S.Ct. 1332, 2 L.Ed.2d 1460, 1472]. It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech." (Pp. 730-731.) "In

---

from whom it was unlawfully taken, since that would make him a criminal when he became repossessed of it." *Trupiano* v. *United States*, 334 U.S. 699, 710 [68 S.Ct. 1229, 92 L.Ed. 1163]: "It follows that it was error to refuse petitioners' motion to exclude and suppress the property which was improperly seized. But since this property was contraband, they have no right to have it returned to them." See also *Aday, supra,* at page 800; 44 Cal.Jur.2d § 59, page 404.

[6] "[T]he Constitution, by virtue of the First and the Fourteenth Amendments, has put those freedoms in a preferred position." (*Jones* v. *Opelika*, 316 U.S. 584, 608 [62 S.Ct. 1231, 86 L.Ed. 1691, 1707, 141 A.L.R. 514].)

"Freedom of press, freedom of speech, freedom of religion are in a preferred position." (*Murdock* v. *Pennsylvania*, 319 U.S. 105, 115 [63 S.Ct. 870, 87 L.Ed. 1292, 1300, 146 A.L.R. 81].)

consequence there were suppressed and withheld from the market for over two months 180 publications not found obscene. The fact that only one-third of the publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards than were here operative. Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees.'' (Pp. 732-733.)

That this search, seizure and sequestration of petitioner's books, etc., worked a restraint upon free speech and free press, is developed at page 736: ''[T]here is no doubt that an effective restraint—indeed the most effective restraint possible—was imposed prior to hearing on the circulation of the publications in this case, because all copies on which the police could lay their hands were physically removed from the newsstands and from the premises of the wholesale distributor. An opportunity comparable to that which the distributor in *Kingsley Books* might have had to circulate the publication despite the interim restraint and then raise the claim of nonobscenity by way of defense to a prosecution for doing so was never afforded these appellants because the copies they possessed were taken away. Their ability to circulate their publications was left to the chance of securing other copies, themselves subject to mass seizure under other such warrants. . . . A distributor may have every reason to believe that a publication is constitutionally protected and will be so held after judicial hearing, but his belief is unavailing as against the contrary judgment of the police officer who seizes it from him. Finally, a subdivision of the New York statute in *Kingsley Books*[7] required that a judicial decision on the merits of obscenity be made within two days of trial, which in turn was required to be within one day of the joinder of issue on the request for an injunction. In contrast, the Missouri statutory scheme drawn in question here has no limitation on the time within which decision must be made, only a provision for rapid trial of the issue of obscenity. And in fact over two months elapsed between seizure and decision. In these circumstances the restraint on the [circulation] of publications was

---

[7]*Kingsley Books, Inc. v. Brown,* 354 U.S. 436 [77 S.Ct. 1325, 1 L.Ed. 2d 1469].

far more thoroughgoing and drastic than any restraint upheld by this Court in *Kingsley Books*.''

This was but the development of the thesis advanced in *Smith* v. *State of California*, 361 U.S. 147 [80 S. Ct. 215, 4 L. Ed. 2d 205], which held that a bookseller could not be convicted constitutionally under a statute declaring it to be unlawful to have possession in a book store of any obscene book without requirement of proof that the dealer had knowledge of the contents thereof. Mr. Justice Brennan, who spoke for the court there as in Marcus said, at page 150: ''But the question here is as to the validity of this ordinance's elimination of the scienter requirement—an elimination which may tend to work as substantial restriction on the freedom of speech and of the press.'' At page 153: ''By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. For if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature.'' At page 154: ''The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded.'' Mr. Justice Harlan concurring in part and dissenting in part (at page 171): ''The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates. This being so, it follows that due process 'using that term in its primary sense of an opportunity to be heard and to defend [a] . . . substantive right,' [citations]—requires a State to allow a litigant in some manner to introduce proof on this score. While a State is not debarred from regarding the trier of fact as the embodiment of community standards, competent to judge a challenged work against those standards, it is not privileged to rebuff *all* efforts to enlighten or persuade the trier.''

To put it more succinctly, the *Marcus* decision comes down to this: An exploratory search and seizure of literary property, not supported or supportable by a valid search warrant, which is followed by immediate and prolonged sequestration of seized articles without the sanction of a court

hearing based upon factual evidence as to obscenity, effects a prior restraint upon freedom of speech or press and constitutes a denial of procedural due process of law, which renders all seized properties the "fruits of a poisonous tree"[8] and makes them unusable in any court, civil or criminal; they cannot be deemed obscene because that fact, if a fact, has not been determined in a manner required by the concepts of due process, and hence the seized items must be restored to the persons from whom they were taken.

The United States Supreme Court ordered a flat reversal in *Marcus* without any discussion of the question of severance. This is explained by the fact that the search warrants were general and exploratory and did not particularly describe any publications, while the warrants in the Alameda case and the one at bar did do so. We deem the *Marcus* decision not in conflict with the *Aday* case, *supra*, in this respect. ██ Indeed our Supreme Court used this language in *People* v. *Keener*, 55 Cal.2d 714, 723 [12 Cal.Rptr. 859, 361 P.2d 587] : "Where a warrant does not comply with the essential statutory and constitutional requirements relating to particularity of description, it cannot properly be regarded as protecting against unlawful searches, and the policy of encouraging the use of warrants obviously does not contemplate the use of void warrants."

██ The search warrant here under examination was void except as to two books named therein—"Joy Killer" and "Sex Life of a Cop"; it affords no justification for search for other publications or seizure thereof. *A fortiori* any search extending beyond the confines of the warrant was unlawful. ██ Determination by police officers of the status of suspected books, papers, etc.—whether to be classified as obscene or not obscene—is not enough protection to the owner to constitute due process. ██ Refusal of the magistrate to entertain evidence of whether particular items are obscene was an active denial of due process; refusal or failure to return to petitioners, as ordered, items found to be not obscene, which refusal and failure have extended for about a year, is also a denial of due process in this case. ██ The refusal of the magistrate who was charged with the duty of fixing the status of the respective seized articles to hear evidence upon the question of whether they are obscene is of such gravity in

[8]*Nardone* v. *United States*, 308 U.S. 338, 341 [60 S.Ct. 266, 84 L.Ed. 307.].

a case dealing with books, magazines and other utterances, that the search and seizure must be condemned completely and authority of the district attorney or other public officials to withhold said items for use as evidence in a criminal prosecution of their owners must be held to be nonexistent. Under the facts of this case respondents must restore to petitioners all the items of property which were seized in this instance and must do so whether the particular items are pornographic or not pornographic. This for the basic reason that their status has not been established in a manner required by due process, i.e., after an early hearing at which evidence is taken if offered and a decision based thereon made promptly by a court, not a mere enforcement officer.

The *Aday* and *Marcus* decisions readily may be harmonized upon the matter of severability of the warrant or the search; our State Supreme Court holds that this may be done where the search warrant names publications which are suspect and hence to be seized, although it extends beyond that and into a field which the underlying affidavit does not justify. *Marcus* is not to the contrary in this respect, for the warrant there under consideration was general, specifying no particular publication for seizure, but *Marcus* prevails over any inconsistent matter in *Aday* which pertains to withholding of seized property without establishing through a court hearing and at an early date the fact of contraband publication. ▉ As applied to the facts in hand, the *Marcus* ruling requires a holding that the seizure must be followed expeditiously with a court hearing, if desired by the owners, and a prompt determination of whether the property or some specified portion of it shall be returned to the persons from whom seized. It does not permit us to condone any such refusals to hear evidence concerning obscenity or any such delays in ordering and executing orders to return to petitioners innocuous publications whose status has been fixed by a court finding.

*Aday* says (p. 799) that ''immediately after the seizure a determination of the issue [obscenity] to that extent can be obtained in adversary proceedings by controverting the warrant under sections 1539 and 1540 of the Penal Code.'' Though petitioners herein made the attempt they did not obtain such immediate relief for they were denied the essence of an adversary proceeding, the taking of evidence on the controlling issue, nor did they obtain a prompt ruling. *Aday* also says that in the event the owner is unsuccessful in that

proceeding "a final determination as to obscenity will be had in the criminal action which will ordinarily follow *within a reasonable time*, or other remedies such as mandamus will be available to secure return of the property" (emphasis added), and that "[t]hese various remedies satisfy the requirements of due process. . . ." We are satisfied that the rationale of the *Marcus* opinion requires that a determination of the question of obscenity be made after hearing of factual evidence (if requested) and before the trial of the case; that the seized property cannot be used in evidence against the owner unless it has been previously established in such factual hearing to be contraband. That is the purport of the *Marcus* discussion of "sensitive tools" essential to separation of legitimate from illegitimate speech (p. 731). As previously stated, it is incumbent upon this court to order immediate return to petitioners of all seized articles regardless of what their actual character be, whether pornographic or nonpornographic.

The search and seizure were made on March 15-18, 1961; the indictment of petitioners was returned on April 25, 1961. At the oral argument of this case counsel advised us that the seized books, etc., are being held for use in the criminal trial of petitioners and the trial has been postponed from time to time awaiting a decision in the instant proceeding. So our order this day made appears to put an end to the criminal prosecution as a practical matter. In reaching this conclusion it has been necessary for us to cling steadfastly to the basic truth stated in Judge William C. Mathes' aphorism "that the rights of good men are secure only so long as the rights of bad men are also protected."[9]

The members of this court deeply deplore the lack of success which has attended perennial and sincere efforts to control within reasonable limits the myriad forms of indecency that beset this nation[10] and the large part the decisions of courts of review have played in bringing about that situation. But we are required to remember that when government itself becomes lawbreaker the foundations of our freedoms are

[9] "'*A New Order of the Ages*: *Free Speech and Internal Security*,' October, 1956, issue of the American Bar Association Journal, page 929."

[10] See our opinions in *Katzev* v. *County of Los Angeles* *(Cal.App.) 336 P.2d 6, and *People* v. *Williamson*, 207 Cal.App.2d 839 [24 Cal.Rptr. 734].

*A hearing was granted by the Supreme Court on April 22, 1959. The final opinion of that court is reported in 52 Cal.2d 360 [341 P.2d 310].

weakened, and unless official oppressors are restrained those foundations may completely collapse.

By reason of the shifting of possession of certain of the seized items between the clerks of the municipal and superior courts and the vagueness of the returns filed herein, the court undertook upon oral argument to clarify the question of what seized documents or other items are in the possession of the respective respondents. The result is that counsel agreed upon the following: The Superior Court of Los Angeles County has possession of 30 items which were declared by Judge Walters' order of April 5, 1962, to be nonpornographic, which said items are listed in footnote 11 hereof.[11] Those held by him to be obscene are in the possession of the Municipal Court for the Burbank Judicial District and are listed in footnote 12 hereof.[12] Multiple copies of "Cousin Jess" and uncut portions of "The Violent & The Fair" are also in possession of said municipal court. The District Attorney of Los Angeles County has in his possession the items listed in his letter of October 25, 1961, to Brock & Fleishman, copy of which is attached to his return and answer herein, said items being listed in footnote 13 hereof.[13] The Chief of Police of

---

[11]Desperate Moments; Society Daughter; Bold Desires; The Right Bed; Bachelor Husband; I Peddle Jass [Jazz]; Ruthless Fraternity; The Gay Detective; Burden of Guilt; Murder is for the Birds; The Opposite Six; Satan's Harvest; The Lady was a Man; A Road Divided; Long December; Push-Over; High Pillow; Beach Maverick; The Gay Ones; Man is a Sexual Being; Nor Fears of Hell; Imposed Rebellion; Our Flesh was Cheap; One Violent Year; Tomorrow's Light; Passionate Lovie; The Third Bedroom; Return to Vista; Beyond the Realm; Age of Insolence; The Violent & The Fair; Tainted Rosary.

[12]Executive Bed; The Takers; Included Out; Campus Iniquities; Karla; Love Princess; I am a Lesbian; Never Enough; Deception; Camera Bait; The Odd Switch; Decisive Years; Rene; The Black Night; My Bed has Echoes; Stairways to Sin; The Rambling Maids; Dark Quarters; Tainted Wife; Violent Surrender; Taxi Dancers; Naked Return; Rose of Sharon; Witch Finder; Never to Belong; Between the Two; Twice a Fool; Emotional Jungle; Cherita; Joy Killer.

[13]"A number of yellow sheets entitled Wholesalers and Retailers 200 and Under, containing prints appearing to be from an addressograph. A book of checks on the Bank of America, Burbank Branch for MTP Bindery Company, 2844 North Lima, Burbank, California. A sheaf of papers containing prints from what appears to be an addressograph together with bills of sale. A sheaf of papers titled Weekly Production Sheet. Two yellow pages from what appears a pay roll journal. Two pieces of loose leaf paper containing pen and ink numbers. Two bills of ladings attached to notations of the Navajo Freight Lines. A bill of lading from Fortier Transportation Company. A pad of paper containing the printing, 613 Mission Street, Room 406, San Francisco 5, California. Three sheets of paper entitled Navajo Freight Lines, Inc., National Headquarters, Denver 3, Colorado. A letter from Swift and Company,

the City of Burbank has possession of multiple copies of seized books, both obscene and nonobscene, and other miscellaneous documents and property.

The superior court and its clerk are ordered to return forthwith to petitioners each and all of the publications listed in footnote 11 hereof. Said municipal court and its clerk are ordered to return forthwith to petitioners each and all of the publications listed in footnote 12 hereof, together with all copies of ''Cousin Jess'' and uncut portions of ''The Violent & The Fair'' now in their possession. The District Attorney of Los Angeles County is ordered to return forthwith to petitioners the documents listed in footnote 13 hereof, and the Chief of Police of the City of Burbank is ordered to return forthwith to petitioners all of the copies of books and all miscellaneous documents and other properties now in his possession. Each of respondents is ordered to return to petitioners any of the articles mentioned in the fourth paragraph of this opinion which are in the possession of said respondent. A peremptory writ to that effect will issue. It will specify February 14, 1963, at 1:30 p.m. as the return day and hour. All respondents are reminded of the fact that they are agencies for enforcement of law and of the basic truth thus voiced in *Commonwealth* ex rel. *Kelley* v. *Kelly,* 322 Pa. 178 [185 A. 307, 310] : ''We are of opinion that there is a broad principle of public policy involved which may be stated thus: When the judicial branch of the government is called upon to adjudge the rights and powers of another branch of the government, all of the officers involved should recognize the prerogatives of the court, and should not, without requesting and receiving its sanction, undertake to disturb the status quo until the court has rendered its decision.''

Let the writ issue as aforesaid.

Fox, P. J., and Herndon, J., concurred.

The petitions for a rehearing were denied December 26, 1962, and respondent's petition for a hearing by the Supreme Court was denied January 23, 1963.

Adhesive Products Department. Two blank envelopes from MTP Bindery. A business card of one Miller Brothers Printing and Stationery, 1003 West Olive Street, Burbank, California. A slip of paper containing pen and ink writing entitled 'Inventory returns from Warner.' A Pacific Telephone and Telegraph blue book of telephone numbers. An envelope stating Burbank Branch, Bank of America, P. O. Box 351, Burbank, California.''