51 Cal.Rptr. 815]

## Appellate Department, Superior Court, San Diego

[Crim. No. 8938. May 25, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. VINCENT NATHAN CAMPISE, Defendant and Appellant.

Langford, Langford & Lane and J. Perry Langford for Defendant and Appellant.

Edward T. Butler, City Attorney and James D. Allen, Deputy City Attorney, for Plaintiff and Respondent.

James Don Keller, District Attorney (San Diego), and Richard H. Bein, Deputy District Attorney, as Amici Curiae on Behalf of Plaintiff and Respondent.

Before Glen, P. J., Toothaker, J., and Conyers, J.

THE COURT.—Defendant was found guilty after a trial by the court on a charge of knowingly exhibiting obscene motion pictures in violation of Penal Code, section 311.2.

Defendant appeals on the grounds that the films in evidence were first exposed to police officers during a wrongful search; that the films were, in any event, illegally seized by the officers, without any warrant, and without any prior judicial determination of obscenity; that the evidence did not establish an exhibition of the films; that in fact and law the films are not obscene; and, finally, that the evidence did not establish that defendant knew the material was obscene.

At the time of the offense defendant owned and operated a small business in downtown San Diego in which he sold clothing and secondhand books and magazines. In a back room of the store were booths containing six "peep-show" machines, four of which projected the rolls of 16 millimeter movie film which were received in evidence. There was a seat by each machine. The projectors were coin operated, either a dime or a quarter (in different machines) permitting two minutes of viewing.[1] Although the door into the back room

---

[1] "Q. What's the difference, why the difference in price?
A. I really don't see no difference. They just think a quarter is much better to put it [sic] in. They are all the same film." (Rpr. Tr., pp. 81 and 82.)

was curtained, the defendant quite apparently had not attempted any concealment of this part of his business. Over the inner door was a sign reading "Movies," and the two prices, and "Girls, Girls." The outside of the store held signs reading "Ace Clothing," and, "Ace Movies."[2]

 Defendant testified that his clothing and book business had been failing when he learned of the availability of "these motion pictures." A local distributing agent for the Los Angeles owner of films and projecting machines talked to defendant about installing equipment in his store. Defendant was to share equally with the owner in the gross receipts of the installation. The owner would construct the booths, furnish the machines and keep them in repair, deliver new film each two weeks and open the coin boxes for a division of the money. The agent and the owner told defendant that it would be legal "to run this," but, if the police ever closed him up the owner would "take care of everything."

Before obtaining any equipment or films defendant "went out and—checked just about every machine in San Diego." He knew other local businessmen then operating peep shows and presumably discussed the subject with them. They were supplied by the same Los Angeles owner. In February of 1965, workmen installed the booths and equipment in defendant's store.

. The first two weeks of operation caused the defendant to complain to the owner that the film was old, was "just slices of everything there were . . . say, junk." The film kept breaking, causing frequent calls for servicing. Defendant himself learned at least to install the film, and to focus the picture.

A day or two prior to the arrest in these proceedings the film in evidence was brought to defendant's store and placed in the machines for viewing. The store was open for business, and when the officers observed the machines a portion of each film "had been played." The evidence was conflicting as to whether defendant personally had viewed any of these films.

Defendant's store was open on March 16, 1965, at about 2 p.m., when police officers arrived. They had no search warrant. Defendant was advised of his constitutional rights: that he didn't have to say anything, that anything he did say could be used against him, and that he had a right to an attorney. "Then [the police] asked him if we could have his

---

. [2]The trial judge, who visited the premises, found nothing surreptitious in the merchandising of the films.

permission to take a look at the film in the peep shows." The defendant agreed, and turned the machines on. An officer was "assigned" to each machine. After this viewing the defendant was arrested and the film (in evidence) was impounded.

The trial judge viewed the films, believed them to be hardcore pornography, and found defendant guilty.

### The Search

Defendant contends that any validity of the officers' first view of his films must depend upon his voluntary consent. He argues that his apparent consent was not voluntary because he could only have chosen between permitting a search, and incriminating himself by refusing to permit it; and that the granting of one right cannot be thus conditioned upon the surrender of another.

As the People point out, the defendant himself testified that he gave his consent (and assistance) to the officers' view. There was no testimony or other evidence to the contrary, and the judge found that defendant's consent was voluntary.

*Aptheker* v. *Secretary of State,* 378 U.S. 500 [84 S.Ct. 1659, 12 L.Ed.2d 992], relied on by defendant, holds merely that the federal government cannot restrict the right to travel on the basis of organizational membership alone. The act[3] was not saved because a relinquishment of the right to associate would regain the right to travel.

The right against unreasonable government search is of course not made dependent upon a waiver of the right against self-incrimination. Inroads have been made on the presumption that citizens know the law, but defendant's present contention would abandon it altogether. If government is still assumed to be the King of England, from whose worst notions the amendments have saved us, does even the sound of his voice now offend his subjects' tranquility? Can no citizen engage him in serious discourse, for whatever reason intelligence may suggest, without being said to have lost all independence? If reasonable enforcement of the law must now await everyman's perfect understanding of it, then only a few lawyers may be in jail.

Particularly under the circumstance that this "search" occurred in a part of a business establishment open to the public (see *People* v. *Murray,* 218 Cal.App.2d 317 [32 Cal. Rptr. 348]), the defendant's present complaint cannot be sustained.

---

[3] Subversives Activities Control Act.

*The Seizure*

█ Defendant argues that there can be no lawful seizure of property on the grounds of obscenity unless there is first a judicial determination of that obscenity. Defendant relies principally upon *Marcus* v. *Search Warrant of Property, etc., Mo.,* 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]. He has overstated the reach of that decision and others.

We would emphasize that the case at bench is concerned with the seizure of four reels of peep-show motion picture film, by police officers who—after lawful viewing—arrested the possessor on a charge of exhibiting them (as obscene films).

The United States Supreme Court has reflected without decision upon the foundations of *Marcus* in *Mishkin* v. *New York,* 383 U.S. 502 [86 S.Ct. 958, 16 L.Ed.2d 56], as follows: "It is also maintained that the seizure in the storeroom was made on the authority of a search warrant: yet neither the affidavit upon which the warrant issued nor the warrant itself is in the record. Finally, while the search and seizure issue has a First Amendment aspect because of the alleged massive quality of the seizures, see *A Quantity of Copies of Books* v. *Kansas,* 378 U.S. 205, 206 [84 S.Ct. 1723, 12 L.Ed.2d 809] (opinion of BRENNAN, J.) ; *Marcus* v. *Search Warrant of Property, etc., Mo.,* 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127], the record in this regard is inadequate. There is neither evidence nor finding as to how many of the total available copies of the books in the various book stores were seized and it is impossible to determine whether the books seized in the basement storeroom were on the threshold of dissemination."

In *Aday* v. *Municipal Court,* 210 Cal.App.2d 229, at page 246 [26 Cal.Rptr. 576], the court states: "To put it more succinctly, the *Marcus* decision comes down to this: An *exploratory search and seizure* of literary property, not supported *or supportable* by a valid search warrant, *which is followed by* immediate and prolonged sequestration of seized articles without the sanction of a court hearing based upon factual evidence as to obscenity, effects a prior restraint upon freedom of speech or press and constitutes a denial of procedural due process of law, . . ." (Italics added.) And again, in *Aday* (210 Cal.App.2d at p. 248) : "As applied to the facts in hand, the *Marcus* ruling requires a holding that the seizure must be followed expeditiously with a court hearing, if desired by the owners, and a prompt determination of whether the property or some specified portion of it shall be returned to the persons from whom seized."

We do not read the present law as requiring any judicial filtering of police judgment on "probable obscenity" prior to a lawful search, an arrest, and a seizure as in this case. If, as the Supreme Courts have said, obscenity is not good for us, then presumably the same immediate necessities may arise for prompt arrest and prompt seizure without warrant to avoid this harm as to avoid any other.

We recognize that any comparison of different, felt necessities for arrest without warrant does not altogether compare with the powers of seizure. *In re Harris,* 56 Cal.2d 879 [16 Cal.Rptr. 889, 366 P.2d 305], was the upshot of a seizure incident to arrest (for selling obscene books) in which "virtually all the books, magazines, writings, publications and papers in petitioner's bookstore were seized." Mr. Justice Traynor then concurring observed (56 Cal.2d at p. 883) that: "Whatever the limitations on the seizure of evidence incident to a lawful arrest may be in other contexts [citation], neither an arrest nor a search warrant can vest an officer with discretion to interfere with the distribution of constitutionally protected publications to the extent that occurred here. (*Marcus* v. *Search Warrants of Property, etc., Mo.,* 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127].) Even if a seizure of representative samples of petitioner's nonobscene publications dealing with sex would have been reasonable to provide evidence of the general character of his business, it was wholly unnecessary to seize 75 to 90 percent of the contents of the store. . . ." While not binding, the *Harris* language does not suggest that the seizure there was bad simply for the absence of a judicially approved warrant, but because books neither believed nor found to be obscene were taken in wholesale sequestration.

Our investigation has not revealed any plain spoken direction that warrants must be used in every obscenity case, nor does reason lead us to that conclusion.

The "more sensitive" due process required in protecting First Amendment rights is provided by the opportunity for determination of the issue of obscenity, in adversary hearing, immediately after the seizure of the property. (*Aday* v. *Municipal Court,* 210 Cal.App.2d 229 at p. 249 [26 Cal.Rptr. 576].) We note in *Aday* that the long proceedings involved a justification of both a search and seizure. Even there the court stated that seizure of an allegedly obscene book is not invalid if made on probable cause "and if the owner of the book has adequate remedies by which to litigate the issue of obscenity." (*Aday* v. *Superior Court,* 55 Cal.2d 789 at p. 799 [13 Cal.Rptr. 415, 362 P.2d 47].)

In some circumstances the issue of probable cause, or "probable obscenity" will of course be the subject of judicial inquiry. (*People* v. *Aday*, 226 Cal.App.2d 520 at p. 531 [38 Cal.Rptr. 199].) In that case the books were acquired by (government) purchase, and not seizure.

Where there is a seizure, however, the owner or possessor is entitled through an early court hearing to have established the fact of contraband quality, i.e. obscenity.

If a warrant was used, the petitioner will have his remedy through Penal Code, sections 1539 and 1540. Whether or not in an obscenity case the defendant could be given "the burden of producing evidence that the articles are not contraband", (as in *Williams* v. *Justice Court*, 230 Cal.App.2d 87 at p. 97 [40 Cal.Rptr. 724]) we do not need to decide. If the court meant only that a petitioner may be bound by his own choice of issues, then certainly his constitutional opportunity for challenge is not limited. If the court meant that a petitioner in a case involving First Amendment issues has the burden of proof, then we avoid speculation.

Where a warrant has not been used, defendant may move to suppress, move to return, or petition for a writ of mandate. (*Gershenhorn* v. *Superior Court*, 227 Cal.App.2d 361 [38 Cal. Rptr. 576].)

While this analysis may seem gratuitous here, since defendant made none of these pretrial moves, their availability makes it proper now to deny his objections to the seizure.

### Exhibition

▉ Defendant argues that the evidence did not establish what portion of the film, if any, was exhibited. He seems to contend, as the People state, that "to exhibit" is synonymous with "to view," or "to have seen."

Black's Law Dictionary, Fourth Edition, defines the verb "to exhibit" as: "to show or display, to offer or present for inspection."

The evidence was sufficient to support a finding, inherent in the court's decision, that defendant not only presented the films for public view, but that they were in fact (and in part) viewed by the public. As to the effect of any partial viewing, both defendant's counsel and the trial court observed that all the reels were pretty much alike, "that there is little to choose between them."

### Obscenity

▉ Defendant contends that the films are not hard-core pornography, that their appeal is not to a morbid or shameful

interest, that they do not go substantially beyond the customary limits of candor, and that they have a redeeming social importance. He fairly concedes that his contentions here will necessarily turn at last on the court's reaction to viewing the motion pictures. (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901 at p. 909 [31 Cal.Rptr. 800, 383 P.2d 152].) ▆▆ Of course, films may be included within the free speech and free press guaranty of the First and Fourteenth Amendments to the federal Constitution. (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495 [72 S.Ct. 777, 96 L.Ed. 1098].)

▆▆ We have viewed the evidence in this case. Each of the four reels of film, in black and white photography, pictures a series of individual female subjects on beds, on couches, on chairs, and on the floor. Sooner or later each woman is quite naked. Only one woman appears in each sequence; and she appears in long shots, close-up shots, and very close-up shots. There is no music (or any sound), no dancing, no story line. Each woman, without exception, simulates passion, assumes the body positions and movements of sexual intercourse, and occasionally feigns masturbation. The movements and picture angles of the camera itself contribute to the intimacy, the drawn out sexuality, the unmistakable "participation" of the subjects. The pictures are not comparable to a "typical bump and grind dancer." Except for nature's own differences, and some variety in small props[4], each film sequence and each reel is distressingly alike. "Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty."[5]

Defendant argues, among other things, that exposure of all but the pubic area has long been acceptable in the art of our culture. The evidence here is not always so modest as he implies, but the difference—in any event—lies in the difference between the body exposed and the body in coitus.

It is not our job to imagine what harm might come from these pictures. We do say, however, that the evidence indicates, and the trial court was justified in finding, that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, which goes substantially beyond customary limits of candor in the representation of nudity and sex, and is utterly without redeeming social importance.

---

[4]Books, cigarettes, torn panties, whiskey, pillows, garters belts, etc.
[5]D. H. Lawrence, Pornography and Obscenity, page 13.

### Scienter

▇▇▇ Defendant contends that the case must fall because the evidence showed that he did not believe the films were obscene; that honest mistake is a defense under the California statute.

The statute (Pen. Code, § 311, subd. (e)), defines "knowingly," as "having knowledge that the matter is obscene."

The United States Supreme Court has said in *Mishkin* v. *New York,* 383 U.S. 502 [86 S.Ct. 958, 16 L.E.2d 56], that is was unnecessary at that time for it to define what sort of mental element is required to a constitutionally permissible prosecution. This forbearance arose from the New York court's definition of scienter which, it said, "fully meets the demands of the Constitution." "A reading of the statute . . . as a whole clearly indicates that only those who are in some manner aware of the *character* of the material they attempt to distribute should be punished. It is not innocent but *calculated purveyance* of filth which is exorcised. . . ."

▇▇▇ The Legislature is presumed to be reasonable. We know that obscenity in expression can ultimately be dealt with by the government as illegal, or as contraband, only if the owner (or a defendant) is first given at trial, or, at pretrial proceedings, a full adversary hearing on the issue of obscenity. If scienter is taken as a prescience of *that* outcome, then Justice Frankfurter would be right: it would "nullify for all practical purposes the power of the State to deal with obscenity."[6]

Defendant in the case at bench—in a generally very good brief—contends there is no impasse in the "predictable outcome" construction, since "truly obscene matter is such that defendants, like Mr. Justice Stewart, know it when they see it. With such material, proof of knowledge of the contents will support an inference of knowledge of obscenity." Perhaps unfortunately, other defendants may choose other justices. The uneasiness of all courts (and many sensible men) in this predicament may contribute to the convictions of the judicial minority, that government should keep its hands off expression altogether, so long as conduct is not involved.

Our own Supreme Court has observed that "the casebooks are filled to overflowing with the courts' struggles to determine just what state of mind should be considered relevant in particular contexts." (*People* v. *Hernandez,* 61 Cal.2d 529 at

[6] Concurring in *Smith* v. *California,* 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205].

p. 532 [39 Cal.Rptr. 361, 393 P.2d 673].) Again the court in *Hernandez* has stated (at p. 534) : ''There can be no dispute that a criminal intent exists when the perpetrator proceeds with utter disregard of, or in the lack of grounds for, a belief . . . (that the female has reached the age of consent). But if he participates in a mutual act of sexual intercourse, believing his partner to be beyond the age of consent, with reasonable grounds for such belief, where is his criminal intent?''

We see no constitutional or statutory necessity for permitting a rational businessman to defend an obscenity charge on the issue of his personal capacity for pornography.

When the United States Supreme Court in *Mishkin* approved a formula that ''those who are *in some manner aware of the character* of the material they attempt to distribute should be punished'' (italics added), reason suggests that the court was not finding it necessary to leave loopholes for future constitutional decision on what evidentiary circumstances may be relevant to simple knowledge of the contents of material; but, to conclude that ''character of the material'' is the equivalent of ''contraband nature of,'' or ''obscenity of,'' is also to decide what was *not* plainly written. It really must be suspected that the Supreme Court shrank from the hard point of it.

In this posture of the matter (and no California decisions have been cited to us) we must in this case say that a reasonable construction of Penal Code, section 311, subdivision (e) is as follows : The defendant must have known the contents of the material, and must have been in some manner aware of its obscene character.

In short it is not necessary to construe ''knowledge that the matter is obscene'' as meaning ''knowledge that a court would decide the matter to be obscene.''

We need not recite again the evidence herein to say that it amply supports the trial judge's decision in respect to this defendant's scienter.

The judgment is affirmed.